Dave LEONARDSON, Terrance Barrett, Paul Kupperman, individuals living in a Police Zone established by the City of East Lansing, MI, Plaintiffs–Appellants,

v.

CITY OF EAST LANSING, John B. Czarnecki, Mayor; Joan B. Hunault, Mayor Pro–Tem; Liz Schweitzer, Ralph Monsma, David L. Balas, Council Members; Robert Foster, Police Chief; Tom Dority, City Manager; all of the City of East Lansing individually and in their representative capacities, Defendants–Appellees.

No. 89–1055.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1989.
Decided Feb. 13, 1990.

Dorean M. Koenig (argued), T.M. Cooley Law School, Lansing, Mich., for plaintiffs-appellants.

Thomas M. Hitch (argued) and Dennis E. McGinty, East Lansing, Mich., for defendants-appellees.

Before MARTIN and NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Plaintiffs-appellants, Leonardson, Barrett and Kupperman, appeal the district court's judgment granting defendants-appellees', the City of East Lansing's, motion for summary judgment that Ordinance 653 is constitutional and not preempted by the Governor's Emergency Powers Act, Mich. Comp.Laws Ann. § 10.31 et seq. For the following reasons, the judgment of the district court is affirmed in part and reversed in part.

I.

On April 7, 1987, the City of East Lansing passed Ordinance 653, which authorized the mayor, based upon a finding and recommendation by the chief of police, to establish a safety zone or police line to prevent the occurrence of certain specified emergencies. The Ordinance stated:

9.111. *Safety Zone, Police Line:*

(a) When any fire, accident, explosion, parade, calamity, public disturbance, public nuisance as defined by section 9.47 [1]

---

1. A public nuisance is defined in Section 9.47:

A social gathering or party which is conducted on premises within the City and which, by

of this Code, or other occasion or event causes or may cause persons to collect on the public streets, sidewalks, or other areas of the City, the Chief of Police or officer acting for him or her may establish a safety zone, or police line as may be necessary for the purpose of affording a clearing for:

(1) the protection of persons and property;

(2) police officers, firemen, emergency medical personnel, and other personnel performing operations in accordance with their duties;

(3) the exclusion of the public from the vicinity of a fire, accident, explosion, calamity, other emergency or public disturbances or public nuisance;

(4) the passage of a parade;

(5) the movement of traffic.

Penalties were provided for violations of the Ordinance. Section 9.111(b), (c) stated:

(b) Any person who shall knowingly cross any such line, knowingly enter into any such zone, or remain in any such zone after being requested to leave, shall be guilty of a misdemeanor. Provided, that bona fide and properly identified representatives of the press and media, residents, medical or clerical persons intending to minister to residents of the zone, and such other persons as the Chief of Police or officer acting for him or her may be permitted to cross such lines or enter into such zone, and may remain in such zone so long as they will not and do not interfere with emergency personnel performing their duties.

(c) Every person present within such zone shall comply with any necessary order or instruction of any police officer and any person who refuses to comply

with the necessary order of a police officer shall be guilty of a misdemeanor.

Finally, Section 9.112 of the Ordinance empowered the mayor to establish a police line based upon an affidavit of the chief of police.

9.112. *Mayor's Authority to Establish Safety Zone.*

When the Chief of Police has reasonable or probable cause to believe and does believe that an event or occasion described in section 9.111 will occur, the Police Chief may file a verified statement with the Mayor setting forth the basis for such belief and a recommendation that a safety zone or police line be established to prevent, suppress, or contain such occurrence or event. If the Mayor is satisfied from all the facts contained in the statement, including reliable information supplied to the Chief from credible persons that reasonable and probable cause exists, the Mayor may authorize the establishment of a safety zone and/or a police line for such locations and periods of time as may be necessary to prevent, suppress, or contain such event or occurrence. Such Mayoral order shall be effective only until the next regularly scheduled Council meeting, or a special meeting called to review such order, but may thereafter be extended or continued by an affirmative vote of a majority of the Council.

The Ordinance was passed in response to a drunken, raucous semi-annual event known as Cedarfest, which had escalated from a gathering of an estimated 2000 students in 1981 to an estimated 4000–6000 people in 1986, and took place along the streets bordering several apartments of primarily student housing known as Cedar

reason of the conduct of those persons in attendance, results in any one or more of the following conditions or events occurring on neighboring public or private property: public drinking or drunkenness, public urination or defecation; the unlawful sale, furnishing, or consumption of intoxicating beverages; the unlawful deposit of trash or litter; the destruction of property; the generation of pedestrian or unlawful vehicular traffic, standing, or parking which obstructs the free flow of traffic or interferes with the ability to ren-

der emergency services; excessive, unnecessary or unusually loud noise which disturbs the comfort, quiet or repose of the neighborhood, including public disturbances, brawls, fights or quarrels; or conduct or condition which injures, or endangers the safety or health of the neighborhood, or results in any indecent or obscene conduct, or results in any immoral exhibition or indecent exposure by persons attending the social gathering or party, is hereby declared to be an unlawful public nuisance.

Village, an area adjacent to the main campus of Michigan State University.

In 1986 the city tried to prevent the occurrence of the event which over the years had resulted in increasingly violent acts of vandalism and destruction of property by intoxicated individuals. However, the police were unable to control the crowd or prevent the destruction of property. The mayor appointed a task force to develop strategies to end Cedarfest. The task force was composed of students, faculty, residents of the Cedar Village apartments and city staff. The mayor also held meetings with law enforcement officials from Kalamazoo, the home of Western Michigan University, and Mt. Pleasant, the home of Central Michigan University. Both cities had had similar problems and had passed ordinances similar to Ordinance 653.

After the Ordinance was passed on April 7, 1987, rumors began to circulate that Cedarfest would again occur in May 1987. On May 15, 1987, the chief of police filed a verified statement with the mayor, setting forth his reasons for believing that Cedarfest would occur on May 16, 1987,[2] and recommending the establishment of a police line to cordon off the area. The mayor determined that there was probable cause that a public nuisance was likely to occur and pursuant to the Ordinance, the mayor authorized the establishment of a police line which commenced at approximately 4:00 p.m. on Saturday, May 16, 1987, and was removed approximately ten hours later at 2:11 a.m. on Sunday, May 17, 1987.[3] The police cordoned off an area approximately four blocks long and one and one-half blocks wide and restricted access to the area to persons who displayed a proper pass.

Under the authority of the chief of police, prior to the cordoning off of the area, passes were issued to known residents in order to allow them to travel back and forth across the police line. A letter was sent informing the residents that the event known as Cedarfest would no longer be allowed to take place. The letter stated:

> To accomplish this, entry into your neighborhood on the day of the event must be restricted to persons residing in the area. . . . The passes are being given to you now and should be kept for use during the remainder of Spring Term. The resident pass is issued to you personally and you should carry it and treat it just like your drivers license, student ID and other personal papers. The pass should not be loaned or given to anyone else. If someone else is found to have it, your pass will be forfeited and they could be arrested.

The police were instructed to enforce the Ordinance by arresting those persons crossing the line without proper identification. According to a memorandum issued by the city manager, the number of people who gathered on the night of May 16th was 250 and the number of arrests was 44. The establishment of the police line and pass system effectively prevented the occurrence of Cedarfest and the destruction of property previously experienced. On September 9th, 1987, the circuit court for Ingham County granted an injunction against planning or participating in Cedarfest "to be held on any weekend in October 1987, May 1988, October 1988, May 1989, October 1989, May 1990, October 1990, or May 1991." In October 1987, residents of Cedar Village were sent a letter similar to the one sent in May, but no police line was established, and the bi-annual event has not occurred since.

Appellants filed suit on August 31, 1987. Appellants were residents of the residential area which had been sealed off, and they had been issued passes. Appellant Leonardson, who stated that he is a real estate broker, not a student, alleged that he was

---

**2.** Six undercover officers circulating in the Cedar Village area and local bars were told by students that Cedarfest would occur the weekend before Memorial Day. The president of a local fraternity told the Police Chief it would occur on that date. The apartment owners and managers of Cedar Village were told by their tenants.

**3.** The mayor authorized the establishment of a safety zone and police line commencing at 4:00 p.m. and "continuing so long as necessary to no later than 12:00 noon on May 17, 1987."

unable to have free ingress and egress to and from his home, he was subjected to being stopped at the perimeter of the line and required to display his pass in order to gain entrance to his own home, and his friends were unable to have access to his home.[4] Appellants challenged the constitutionality of Ordinance 653 and the pass system and requested declaratory relief. In an amended complaint filed on April 22, 1988, appellants included a pendant state law claim, alleging that Ordinance 653 was preempted by the Governor's Emergency Power Act, Mich.Comp.Laws Ann. § 10.31.

Appellants challenged the constitutionality of the Ordinance under the void for vagueness doctrine and on the ground that the Ordinance and pass system burdened the fundamental rights of association and travel and were not the least restrictive means by which to achieve a compelling state interest.

Appellees argued that appellants' constitutional challenge failed because the Ordinance and pass system were not vague, but instead clearly proscribed the prohibited behavior. Appellees alleged that no constitutional right had been infringed upon because a social gathering for the purpose of drinking beer, becoming intoxicated, and then engaging in destructive and anti-social behavior is not protected under the First Amendment.

After considering oral arguments and reviewing cross-motions for summary judgment, the district court entered an opinion and judgment on December 5, 1988, finding that Ordinance 653 was constitutional because it infringed upon no constitutionally protected rights, was rationally related to a legitimate state end, and was not overbroad or vague. The district court also found that the Ordinance was not preempted by the Governor's Emergency Power Act, Mich.Comp.Laws Ann. § 10.31. Appellants timely filed this appeal.

Subsequent to the filing of the appeal, Ordinance 653 lapsed on December 31, 1988, pursuant to a sunset clause contained therein.

II.

■ Defendants-appellees, the City of East Lansing, first argue that this court lacks jurisdiction to hear this case. Appellees allege that because Ordinance 653 lapsed on December 31, 1988, and is no longer in effect, the case is moot and should be dismissed. Appellees rely on *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969), in which the Supreme Court held that a challenge to a Colorado law that was subsequently amended had lost its character as a present live controversy and was therefore moot.

Plaintiffs-appellants, Leonardson, Barrett and Kupperman, argue that the present case is distinguishable because the challenged Ordinance could be reenacted and "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 100–01, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983) (claim for injunctive relief not moot when allegedly illegal police practices are under moratorium).

We find that this case is properly before this court. Although the use of Ordinance 653 appears to have accomplished its goal of stopping Cedarfest, a similar event could cause its reenactment. Unlike the statute at issue in *Hall*, the law has not changed because of an amendment, but lies dormant, ready to be brought back to life if the need for it reoccurs. For this reason, this appeal will not be dismissed as moot.

---

**4.** An affidavit of appellant Leonardson alleged that after the first cordoning off of the area, he received a second letter in October 1987, containing a pass and indicating that the area might again be cordoned off. He contends that he has to live with the ongoing fear and humiliation that he will repeatedly have to carry a pass and present it to the police, and that he will not be allowed to invite friends to his home.

### III.

We must next determine if an overbreadth challenge to Ordinance 653 is warranted. The overbreadth doctrine constitutes an exception to traditional rules of standing and is applicable only in First Amendment cases in order to ensure that an overbroad statute does not act to "chill" the exercise of rights guaranteed protection. *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.") Under the overbreadth doctrine, litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute ... may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). In order for a statute to be found unconstitutional on its face on overbreadth grounds, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court...." *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). Because the invalidation of a statute on overbreadth grounds is, "manifestly, strong medicine," the doctrine is to be employed "sparingly." *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916. The Court has therefore held that "particularly where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2918.

In addressing a facial overbreadth challenge, a court must first determine whether the regulation reaches a substantial amount of constitutionally protected conduct. *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987); *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). The Ordinance in the present case was drafted and applied solely in order to stop the occurrence of Cedarfest, but it was modeled after and tracks the language of a District of Columbia regulation drafted in order to establish police authority to control disorderly political demonstrations against the Vietnam War through the use of police lines. Although the City of East Lansing used Ordinance 653 only once to prevent the occurrence of a drunken social gathering, conduct which we agree is not protected by the First Amendment, the fact that the city adopted an ordinance very similar to one that was used to regulate political speech is indicative of the Ordinance's potential application in a First Amendment context. Although the Supreme Court has "never held that a statute should be held invalid on its face merely because it is possible to conceive of a single impermissible application," *Broadrick*, 413 U.S. at 630, 93 S.Ct. at 2925 (Brennan, J., dissenting), this court is not engaging in mere speculation that Ordinance 653 has the potential for allowing constitutionally protected conduct, in the form of political demonstrations, to be restricted through the use of police lines. Because a similar ordinance was used to control political demonstrations in the past, the potential inhibitory impact of Ordinance 653 is not merely hypothetical. Although the City of East Lansing applied Ordinance 653 to accomplish an entirely different objective, we believe that there is a realistic danger of the Ordinance's application against political speech, which lies "at the core of [the] First Amendment." *Texas v. Johnson*, — U.S. ——, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989). For this reason, we find that on its face Ordinance 653 sweeps within its ambit both constitutionally protected activity, such as political demonstrations, and unprotected conduct, making it subject to an overbreadth challenge.

### IV.

We must next determine whether Ordinance 653 is substantially overbroad and

constitutionally invalid under the void for vagueness doctrine.

### A.

■ The language of Section 9.111 of Ordinance 653 was in large part drawn from the District of Columbia ordinance discussed in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C.Cir.1977). The court of appeals for the District of Columbia held that the ordinance allowing the establishment of police lines to control the public in case of "fires, accidents, wrecks, explosions, parades, or other occasions [that] cause or may cause persons to collect on the public streets" was not unconstitutionally vague. *Id.* at 117–19. The court stated:

> Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.

*Id.* at 117 (citation omitted).

The court found that if the location of the line was clearly indicated and adequate notice was given, which were requirements implicit in the regulation, a person of "common intelligence" would not necessarily have to guess at the meaning of the prohibition. *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The ordinance thus did not deny fair notice.[5]

The court next scrutinized the ordinance [6] to determine whether it was impermissibly vague because the bounds of police discretion were defined so imprecisely as to invite police action in violation of the First Amendment. 566 F.2d at 118. The court found that the phrase "occasions [that] cause or may cause persons to collect on the public streets" could be given a narrowing construction by the limitation of the three functional requirements that followed the phrase within the regulation:

> Any police line must be 'necessary' to achieve one of three basic purposes: (1) clearing the way for the operation of firemen or policemen, a parade or the movement of traffic; (2) excluding the public from the vicinity of 'a riot or disorderly gathering, accident, wreck, explosion or other emergency'; or (3) the protection of persons and property. We find no imprecision of constitutional magnitude in the statement of purposes (1) and (3); it appears to be a reasonable articulation of police duties. Purpose (2) permits the police to isolate the public from a 'riot or disorderly gathering ... or other emergency.'

*Id.* The court, applying the principle of *ejusdem generis*, found that the words "other emergency" took on the color of the five events that preceded them in the sentence, events which did not involve activity protected by the First Amendment.

---

**5.** Appellants concede that Ordinance 653 is not vague because of lack of notice.

**6.** The ordinance in *Cullinane* provides in pertinent part:

Sec. 5a. When fires, accidents, wrecks, explosions, parades, or other occasions cause or may cause persons to collect on the public streets, alleys, highways, or parkings, the Chief of Police, inspector, captain of police, or officer acting for him, may establish such area or zone as he considers necessary for the purpose of affording a clearing for: (1) the operation of firemen or policemen; (2) the passage of a parade; (3) the movement of traffic; (4) the exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion, or other emergency; and (5) the protection of persons and property. Every person present at the scene of such an occasion, shall comply with any necessary order or instruction of any police officer. No person shall enter such area or zone, unless duly authorized by the person in command on such an occasion; Provided, That bona fide representatives of the press and bona fide insurance adjusters or underwriters and such other persons as the Chief of Police may authorize to be within such space, and who shall have plainly exposed to view the press pass or fire pass described in this section, shall be permitted within the lines established by the Police Department under the conditions named in the following paragraph.... 566 F.2d at 117.

We agree that the narrowing construction provided by the *Cullinane* court limits police discretion to the accomplishment of the three basic purposes of the regulation. These purposes are identical to the five purposes enumerated in Section 9.111(a) of Ordinance 653 except for the addition of the phrase "emergency medical personnel, and other personnel performing operations in accordance with their duties" in purpose (2) and the words "calamity," "public disturbances," and "public nuisance" in purpose (3). We do not find that these additional words render Section 9.111 of Ordinance 653 unconstitutionally vague. Public nuisance has a precise meaning.[7] There is no assertion that the word "calamity" is vague. The phrase, "public disturbances," like "other emergency," takes on the color of the other words in the sentence and must be read in the context of the regulation as a whole rather than isolated as an open-ended invitation to the police to set up a police line whenever they see fit. Given this narrowing construction, we find that Section 9.111 of Ordinance 653 limits police discretion to the accomplishment of the five specified purposes, which cannot reasonably be construed to authorize the police to issue orders "infringing the peaceful exercise of First Amendment rights." 566 F.2d at 119. We therefore find that Section 9.111 of Ordinance 653 is not unconstitutionally vague and affirm the judgment of the district court on this issue.

### B.

However, we do not find that the same rationale applies to Section 9.112 of Ordinance 653, a section added by the City Council of East Lansing, which the regulation discussed in *Cullinane* did not contain. The district court, in finding that Ordinance 653 was not unconstitutionally vague, did not discuss Section 9.112.

In *Cullinane*, the court upheld the District of Columbia ordinance as it applied to ongoing demonstrations of a political nature, which were creating a disturbance on the public streets and highways. The court stated that although political demonstra-

tions are a form of protected expression, the First Amendment permits the police to contain or disperse demonstrations that have become violent or obstructive.

It follows that because either obstructive conduct or actual or imminent violence infected the demonstrations in substantial measure, the First Amendment did not insulate them from restraint by way of police lines and sweeps and the application of the failure-to-move-on statute. 566 F.2d at 120.

Accordingly, in *Cullinane*, the court approved the ordinance as a device to control demonstrations which had become obstructive or had been infected with actual or imminent violence, and therefore had lost their protected quality as expression under the First Amendment. As a practical matter, where operation of such an ordinance is limited to the existence of exigent circumstances, police discretion in deciding when to invoke control measures is markedly circumscribed. However, such a limit on police discretion is lacking when an ordinance authorizes a police line to be established prior to the occurrence of an "occasion or event" that causes people to gather on public streets, simply because the event has the potential of evolving into a public disturbance.

Under Section 9.112 of Ordinance 653, a police line may be established as a preventive, as well as a control, device. Pursuant to this section, the city could establish a police line in order to prevent the occurrence of a political demonstration, which is a far cry from the non-speech-related activity of Cedarfest. The mayor, based on a recommendation by the chief of police, has the authority to establish a police line if he believes it is necessary to "prevent, suppress, or contain" an event that may become a public disturbance.

We find that Section 9.112 of Ordinance 653 is unconstitutionally vague because it fails to provide a clear standard to guide the discretion of the mayor, who is charged with administering the scheme. There is nothing to prevent the use of the Ordi-

---

7. *See* footnote 1.

nance prospectively against activities that are entitled to protection under the First Amendment. In *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951), the Supreme Court did not decide whether a permit required to conduct religious worship meetings could constitutionally be denied on the ground that the speaker previously caused disorder; the Court held instead that the permit scheme was invalid on its face because the absence of clear standards to guide the discretion of the police commissioner invited abuse by implicitly empowering him to discriminate on the basis of content in his administration of the scheme. *Id.* at 294–95, 71 S.Ct. at 315. *See also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Staub v. City of Baxley*, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958). In a similar manner, Section 9.112 of the Ordinance could be used in advance to prevent persons wishing to demonstrate from engaging in protected speech or it could be used to set up police lines on an arbitrary basis against political dissenters.

An ordinance lacking explicit standards is unconstitutionally vague because it allows an unrestricted delegation of power, which "in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement." *Cullinane*, 566 F.2d at 117, citing *Gregory v. City of Chicago*, 394 U.S. 111, 120, 89 S.Ct. 946, 951, 22 L.Ed.2d 134 (1969) (Black, J., concurring). Appellees argue that Section 9.112 of the Ordinance is not vague because it is limited in its application to imminent threats of destruction of property and violence. However, the language of the Ordinance is not limited to preventing violent conduct, since it also addresses conduct such as a "parade ... or other occasion or event [that] causes or may cause persons to collect on the public streets, sidewalks, or other areas of the City." Under Section 9.112, the mayor can establish a police line to "prevent, suppress, or contain" events that enjoy First Amendment protection (as well as events which do not) based merely upon his belief, and that of the chief of police, that a public disturbance "will occur." The mayor's order need not be conditioned upon the existence of an imminent threat of property destruction or violence or upon any other meaningful and explicit standard. Accordingly, Section 9.112 impermissibly delegates discretionary authority to the chief of police and mayor to inhibit the exercise of First Amendment freedoms by enforcing the Ordinance in an arbitrary and discriminatory manner. *See Kolender v. Lawson*, 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165, 92 S.Ct. 839, 845, 31 L.Ed.2d 110 (1972); *Edwards v. South Carolina*, 372 U.S. 229, 238, 83 S.Ct. 680, 685, 9 L.Ed.2d 697 (1963). Because Section 9.112 of Ordinance 653 does not include sufficiently explicit and limiting standards, we find that it is unconstitutionally vague.

■ Section 9.112 also allows a system of prior restraint to exist, which is another reason why the Ordinance poses a substantial threat to the free exercise of First Amendment rights. A police line established prior to the occurrence of a demonstration, which has the potential of becoming a public disturbance, would function in the same way as the permit requirement in *Kunz* did, keeping the idea the demonstrators wished to advocate from entering the marketplace of ideas based on a fear of violence. 340 U.S. at 294, 71 S.Ct. at 315. The City of East Lansing's use of Section 9.112 has characteristics similar to Minnesota's use of the statute at issue in *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The statute provided for the abatement, as a public nuisance, of a "malicious, scandalous and defamatory newspaper, magazine or other periodical." *Id.* at 702, 51 S.Ct. at 626. The Court found the statute to be an invalid prior restraint, holding that an appropriate remedy could be found in the libel laws, not in proceedings to restrain publication of a newspaper. *Id.* at 720–22, 51 S.Ct. at 632–33.

Although we recognize the compelling interest which the City of East Lansing has in abating the public nuisance created by Cedarfest, we believe that there are more

appropriate methods than adopting an ordinance which also permits the city to prevent the occurrence of events which enjoy constitutional protection. When there is a clear and present danger of riot, disorder and other immediate threat to public safety, "the power of the state to prevent ... is obvious," *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940), but a legitimate state end cannot be pursued by means that impermissibly restrict expression when a more narrowly drawn law could adequately achieve the state's goal. *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 1159, 99 L.Ed.2d 333 (1988) (an ordinance prohibiting signs critical of foreign governments within 500 feet of embassies is unconstitutional because it infringes on the First Amendment right to free speech and the government's objective of protecting the dignity of foreign diplomats is sufficiently achieved by a law that prohibits the harassment of foreign officials). As the Court in *Gregory* stated, the Constitution does not leave the government powerless to protect the public from "boisterous and threatening conduct that disturbs the tranquility of spots selected by the people ... for homes," but what is needed are narrowly drawn laws "designed to regulate certain kinds of conduct such as marching or picketing or demonstrating," so as to restrict "the times or places or manner of carrying on such activities." 394 U.S. at 118, 89 S.Ct. at 950.

■ We do not find Ordinance 653, as it is presently written, to be such a law. Appellees contend, and the district court held, that Ordinance 653 is a content-neutral time, place and manner restriction similar to the ordinance that was upheld in *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941) (regulation for use of streets for parades and processions is a traditional exercise of control by local governments). We agree that an ordinance does not reach a substantial amount of constitutionally protected conduct if it merely regulates the time, place or manner of expression. *Boos*, 108 S.Ct. at 1169. However, a valid time or place restriction must be site-specific or time-specific to pass constitutional muster. In *Boos*, the Court found that a clause forbidding persons to congregate applied only within 500 feet of foreign embassies and therefore was site-specific and not unconstitutional. *Id. See also Cox v. Louisiana*, 379 U.S. 559, 568–69, 85 S.Ct. 476, 482, 13 L.Ed.2d 487 (1965) (ordinance prohibiting picketing "near" a courthouse upheld); *Grayned v. City of Rockford*, 408 U.S. 104, 110–11, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972) (ban on picketing near school upheld). In each of these cases, the ordinance at issue was crafted for a particular context and the "prohibited quantum of disturbance" was based upon whether normal site-specific activity (involving the embassy, courthouse or school) had been or was about to be disrupted. *Boos*, 108 S.Ct. at 1169. In contrast, Section 9.112 of Ordinance 653 does not purport to limit its restrictions based upon the special nature of a particular place or time. Instead, a police line can be used for "such locations and periods of time as may be necessary to prevent, suppress or contain" any event or occasion described in Section 9.111, if it is believed that the event will occur. ·

■ Finally we must decide whether this flaw makes Section 9.112 of Ordinance 653 substantially overbroad. The district court found that Ordinance 653 was not substantially overbroad. Even though the court noted that the police could unreasonably invoke the Ordinance to disperse a legitimately held political demonstration, the court found that such an imagined use did not reflect a defect in the Ordinance itself, but would merely violate the purpose and scope of the Ordinance. We disagree. The district court based its conclusion on its analysis of Section 9.111 of the Ordinance and significantly made no mention of Section 9.112. Section 9.112 allows for the creation of a police line prior to the occurrence of an event described in Section 9.111 based only upon a fear that the event will occur. We believe that this flaw is a substantial concern in the context of the Ordinance as a whole because it creates a penal statute susceptible of arbitrary enforcement that can be used as a prior restraint against activities protected by the First Amendment. Section 9.112 does not include restrictions limiting its application as a preventive device to a particular time or

place or to conduct outside the protection of the First Amendment such as non-speech-related events which pose a clear and present danger to public safety. Accordingly, while an ordinance more narrowly drawn might have been utilized to permit limited use of police lines to prevent the occurrence of Cedarfest, Section 9.112 of the Ordinance, as it is presently worded, must fail under the standards of the First Amendment. Even though in all its applications Section 9.112 does not reach protected First Amendment activity, we find that Section 9.112 is substantially overbroad because its potential for improper application overwhelms its potential for application to unprotected activity. *NAACP v. Button,* 371 U.S. at 433, 83 S.Ct. at 338.

Because we find Section 9.112 of Ordinance 653 unconstitutional on its face, it is not necessary for us to consider the Ordinance as it was applied, *Kolender,* 461 U.S. at 358 n. 7, 103 S.Ct. at 1858 n. 7, or the pendant state preemption claim. For the reasons stated above, the opinion of the district court is affirmed in part and reversed in part. Section 9.111 of Ordinance 653 is found to be constitutional; Section 9.112, *Mayor's Authority to Establish Safety Zone* is constitutionally invalid because it is vague and substantially overbroad.