**J.D. MARTIN, Plaintiff-Appellant,**

v.

**Jess PARRISH, President of Midland College, Don Hunt, Vice President of Midland College, Raymond Yell, Dean of Midland College and Fred S. Wright, Jr., Kenneth A. Peeler, Gloria Hinojosa, John Cooper, Jack M. Huff, William D. Kleine, Reagan H. Legg, William H. McCright, Jr., and Ralph L. Way, Trustees of Midland College, Defendants-Appellees.**

No. 85–1771.

United States Court of Appeals, Fifth Circuit.

Dec. 12, 1986.

John L. Barnhill, Crosbyton, Tex., for plaintiff-appellant.

Barbara Goolsby, Midland, Tex., John Harrell Feldt, Houston, Tex., for defendants-appellees.

Before JOLLY, HILL, and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

Whether a publicly employed college teacher is constitutionally protected in the abusive use of profanity in the classroom is the most significant issue presented by this appeal. We hold that the constitution does not shield him and therefore AFFIRM the judgment of the district court.

## I. BACKGROUND

Appellant Martin was an economics instructor at Midland College in Midland, Texas. Appellees are the president, vice president, dean and trustees of the college. The dean and vice president originally disciplined Martin in 1983, following a formal

student complaint regarding Martin's inveterate use of profane language, including "hell," "damn," and "bullshit", in class. Martin was warned orally and in writing that should his use of profanity in the classroom continue, disciplinary action requiring suspension, termination or both would be recommended. Heedless of the administrators' concerns, Martin continued to curse in class, using words including "bullshit," "hell," "damn," "God damn," and "sucks." Two students filed written complaints concerning Martin's speech in the classroom on June 19, 1984, which included the following statements: "the attitude of the class sucks," "[the attitude] is a bunch of bullshit," "you may think economics is a bunch of bullshit," and "if you don't like the way I teach this God damn course there is the door." Following notice of this outburst, the dean initiated actions to terminate Martin, which culminated, following several administrative steps, in approval by the college's board of trustees.

Martin's subsequent § 1983 lawsuit alleged deprivation of his first amendment right of free speech, abridgement of an alleged right of academic freedom, and denials of due process and equal protection. The jury found in Martin's favor on issues pertaining to free speech[1] and equal protection and awarded damages, but denied his due process claim. The district court granted judgment n.o.v. to the defendants, finding no evidentiary support for the equal protection allegations and concluding that Martin's profanity was not constitutionally protected. Martin appeals all but the due process claim.

## II. ANALYSIS

Appellant asserts his language was not obscene, *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957),

but only profane and as such enjoys constitutional protection unless it caused disruption.[2] *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). We find this argument an incomplete and erroneous expression of pertinent first amendment jurisprudence.

█ The constitution protects not simply words but communication, which presupposes a speaker and a listener, and circumscribes this protection for purposes which enhance the functioning of our republican form of government. The "rights" of the speaker are thus always tempered by a consideration of the rights of the audience and the public purpose served, or disserved, by his speech. Appellant's argument, by ignoring his audience and the lack of any public purpose in his offensive epithets, founders on several fronts.

█ *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), recently explained the limits of first amendment protection of speech afforded public employees like Martin. The Supreme Court reiterated that the goal of such protection is to prevent suppression of such employees' participation in public affairs and "chilling" of their freedom of political association. 461 U.S. at 145–46, 103 S.Ct. at 1689. It is limited to speech on matters of "public concern," otherwise, government would be hobbled in its regulation of employment conditions, and public employees would enjoy an immunity from the consequences of their speech not shared by anyone in the private sector. If the offending speech does not bear upon a matter of public concern, "it is unnecessary for us to scrutinize the reasons for [the] discharge." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Moreover, "whether an employee's speech

---

1. Some of the jury interrogatories regarding the free speech issue asked for a balancing of Martin's language between its usefulness to his instruction and its disruptive tendency. Such balancing involves a question of law for the court. *Connick v. Myers*, 461 U.S. 138, 199 n. 7, 103 S.Ct., 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983).

2. Appellant also argues vigorously that he has a first amendment right to "academic freedom" that permits use of the language in question. It is, however, undisputed that such language was not germane to the subject matter in his class and had no educational function. Thus, as in *Kelleher v. Flawn*, 761 F.2d 1079, 1085 (5th Cir.1985), we find it unnecessary to reach this issue.

addresses a matter of public concern must be determined by the content, form, and context of a given statement...." *Id.*[3]

There is no doubt that Martin's epithets did not address a matter of public concern. One student described Martin's June 19, 1984, castigation of the class as an explosion, an unprovoked, extremely offensive, downgrading of the entire class. In highly derogatory and indecent terms, Martin implied that the students were inferior because they were accustomed to taking courses from inferior, part-time instructors at Midland College. The profanity described Martin's attitude toward his students, hardly a matter that, but for this lawsuit, would occasion public discussion. Appellant has not argued that his profanity was for any purpose other than cussing out his students as an expression of frustration with their progress—to "motivate" them—and has thereby impliedly conceded his case under *Connick.*

Ignoring that his audience consisted of students also led to Martin's undoing. Indecent language and profanity may be regulated in the schools, *Bethel School District No. 403 v. Fraser,* —— U.S. ——, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), and over the public airwaves. *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). The policies leading to affirmation of some speech restrictions in these circumstances support the college's termination of Martin. In *Bethel,* the Supreme Court affirmed disciplinary action against a high school senior who, against the advice of teachers and in violation of school rules, gave a sexually explicit and vulgar speech to a student assembly. As the majority opinion states,

> "Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. · Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavors the use of terms of debate

highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanction."

*Bethel,* 106 S.Ct. at 3165 (citations omitted). Moreover, the first amendment does not prevent schools from determining "that the essential terms of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent or offensive speech and conduct." *Id.*

*Bethel* admittedly involved a high school audience and it may be suggested that its justification for speech restraints rests largely on this fact. Nevertheless, we view the role of higher education as no less pivotal to our national interest. It carries on the process of instilling in our citizens necessary democratic virtues, among which are civility and moderation. It is necessary to the nurture of knowledge and resourcefulness that undergird our economic and political system. Repeated failure by a member of the educational staff of Midland College to exhibit professionalism degrades his important mission and detracts from the subjects he is trying to teach. The school officials uniformly made this point at trial, testifying that use of profanity in the classroom is unprofessional and hinders instruction. Parrish, the college president, emphasized that it is vital for the teacher to have respect for the students, especially when he is in an authority role. Parrish further observed that a teacher's conduct can strongly influence the students, even at the college level. Indirectly confirming these views, one student described Martin's outpouring as unprofessional and stated that he had lost interest in economics as a result of Martin's belittling comments. Another student expressed his reticence to asking questions in class for fear of Martin's ridicule. To the extent that Martin's profanity was considered by the college administration to inhibit his effectiveness as a teacher, it need not be tolerated by the

---

**3.** Only if the speech passes this first test of protection does the court "balance" the employee's rights against any disruptive effect on the

employer's mission. *Connick,* 461 U.S. at 151–55, 103 S.Ct. at 1692–94.

college any more than Fraser's indecent speech to the Bethel school assembly.[4]

Martin's termination also draws support from *FCC v. Pacifica Foundation, supra,* in which the Supreme Court upheld an FCC order disapproving radio broadcast of a vulgar and indecent George Carlin monologue. A principal ground for the Court's conclusion was the fact that, going into private homes over the airwaves, the broadcast was thrusting patently offensive speech upon an unwilling, "captive" audience, likely including minors. 438 U.S. at 749–51, 98 S.Ct. at 3039–3040. It is true that vulgarity in Central Park may be tolerated and protected by the First Amendment because its unwilling viewer or listener has the right to turn away. *Cohen v. California,* 403 U.S. 15, 22–23, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971); *see also Erznoznik v. Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). However, we hold that the students in Martin's classroom, who paid to be taught and not vilified in indecent terms, are subject to the holding of *Pacifica,* which, like *Cohen,* recognizes that surroundings and context are essential, case-by-case determinants of the constitutional protection accorded to indecent language. Martin's language is unprotected under the reasoning of these cases because, taken in context, it constituted a deliberate, superfluous attack on a "captive audience" with no academic purpose or justification.

Were Martin an assistant district attorney who repeatedly used profanity in the courtroom, we have no doubt that he could be terminated for unprofessional behavior. Were he a member of Congress, such language could result in censure. *Bethel,* 106 S.Ct. at 3164. For the foregoing reasons, we conclude his status as a college teacher is no less sensitive to the use of such language than that of a courtroom lawyer or member of Congress.

Martin also challenges the district court's judgment n.o.v. on the issue of equal protection. We have reviewed the record and find that Martin failed to introduce evidence that he had been treated differently from other similarly situated persons, or even that there were others similarly situated. The district court correctly held for the defendants on this point.

The judgment of the district court is AFFIRMED.

ROBERT MADDEN HILL, Circuit Judge, concurring in the judgment.

I concur in the judgment because I believe that *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), controls this case. I write separately, however, because I cannot agree with the majority's unnecessary dicta extending the rationale of *Pacifica, Bethel,* and *Pico* to a university setting.

*Connick* states that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. Whether an employee's speech

---

4. Our conclusion that a public college teacher's classroom use of profanity is unprofessional and may be prohibited by the school relies on the judgment of the Midland College administrators who testified at trial. As the Supreme Court held in *Board of Education v. Pico,* 457 U.S. 853, 864–65, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982), federal courts should ordinarily decline to intervene in the affairs of the public schools, where the "comprehensive authority of States and of school officials ... to prescribe and control conduct has historically been acknowledged". This rule has been enforced in all but the most sensitive constitutional areas. Several Midland College administrators testified on the basis of strong educational credentials and years of experience in their vocation and in the local community. On their shoulders rest the college's educational standards and its utility as a publicly-supported institution. The federal courts thus appropriately respect the professional conclusion of those whose past and future careers depend upon the esteem due to Midland College. "The determination of what manner of speech in the classroom ... is inappropriate properly rests with the school board." *Bethel,* 106 S.Ct. at 3165.

addresses a matter of public concern must be determined "by the content, form and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690.

The majority indicates that the profane nature of Martin's words precludes a finding that a matter of public concern is involved. The use of profane words by themselves, in my opinion, does not preclude a finding that an employee's speech addresses a matter of public concern. Instead, as *Connick* indicates, the record *as a whole* must be examined. Looking at Martin's comments as a whole, I agree with the majority's conclusion that they do not address a matter of public concern. While some of Martin's comments in isolation could be construed as challenging the attitude of the class in its approach to economics, the derogatory nature of the comments overall convinces me that no matter of public concern is involved. For the same reason, I agree with the majority that the question of Martin's first amendment right to "academic freedom" does not need to be reached in this case. While some of the comments arguably bear on economics and could be viewed as relevant to Martin's role as a teacher in motivating the interest of his students, his remarks *as a whole* are unrelated to economics and devoid of any educational function. Thus, I agree with the majority that Martin's discharge did not violate his first amendment rights.

Although I would end the analysis at this point, the majority proceeds to focus on the audience that Martin was addressing, and, citing three Supreme Court cases involving high schools and young children, concludes that the rationale of those cases is equally applicable to a college or university setting. I do not feel it is necessary to reach this issue; furthermore, an examination of the three cases involved raises questions about the majority's conclusion.

The majority first cites *Bethel School District No. 403 v. Fraser*, 478 U.S. ——, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), as support for the proposition that "indecent

language and profanity may be regulated in the schools." *Ante* at 585. Although the majority concedes that *Bethel* involved a high school audience, it extends the rationale of *Bethel* to colleges—without any case support—because it "view[s] the role of higher education as no less pivotal to our national interest." *Id.* at 585. While I agree with the majority's view as to the importance of higher education, my reading of *Bethel* indicates that the Court specifically limited the reach of its holding to high school students. In *Bethel*, the Court noted that the speech in question "could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality." 478 U.S. at —— – ——, 106 S.Ct. at 3164–65, 92 L.Ed.2d at 558–59. The Court went on to note that "[a] *high school* assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of *teenage students.*" *Id.* 478 U.S. at ——, 106 S.Ct. at 3166, 92 L.Ed.2d at 560 (emphasis added). Justice Brennan's concurring opinion is also replete with references which indicate that the rationale of *Bethel* is limited to a high school setting. *See* 478 U.S. —— – ——, 106 S.Ct. 3167–68, 92 L.Ed.2d 561–63 (Brennan, J., concurring).

The majority also cites *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), as support for its conclusion that Martin's first amendment rights were not infringed. In the majority's view, *Pacifica* is relevant because Martin's college students, like the radio audience in *Pacifica*, are a "captive" audience. The majority asserts that Martin's words "constituted a deliberate, superfluous attack on a 'captive audience' with no academic purpose or justification." *Id.* at 586. In addition to the fact that I think some of Martin's words have a possible "academic purpose," the majority again, in my view, reads the holding of that case too broadly. The *Bethel* court stated that *Pacifica* was a case where the Court "recognized an interest in protecting *minors* from exposure to vulgar and offensive spoken

language." *Bethel*, 478 U.S. at ——, 106 S.Ct. at 3165, 92 L.Ed.2d at 559 (emphasis added). The opinion in *Pacifica* emphasized the fact that children were undoubtedly in the audience at the time of the broadcast containing indecent language. *See Pacifica*, 438 U.S. at 748 & n. 28, 98 S.Ct. at 3040 & n. 28, 57 L.Ed.2d at 1093–94 & n. 28. In addition, the language at issue in *Pacifica* was more profane than the language which Martin used before his students. The language which Martin used is no worse than that which a person walking down the streets of most American cities today would hear. Consequently, I do not believe that *Pacifica* is as broad as the majority suggests.

Finally, the majority relies on *Board of Education v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), as support for its position that courts should defer to the judgment of the other faculty members at Midland College. I think the majority's interpretation of *Pico* is, at the least, overbroad and, at worst, unsupported by the language in the opinion. First, as in the other cases the majority relies on, *Pico* involved the question of whether the first amendment limits the discretion of school board officials as it relates to *junior high* and *high school* students, not college students as are involved here. Second, I certainly do not disagree with the majority's statement that local school officials, and not the courts, should run the nation's public school systems. Even at the high school level, however, the Supreme Court has recognized that school officials do not have unlimited discretion. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

Ultimately, as the majority implicitly concedes earlier in its opinion, *ante* n. 1, it is up to the courts and not the Midland College faculty to determine whether the first amendment rights of Martin have been infringed. The majority's approach, however, would appear to preclude a court from reviewing the judgment of an administrator that the use of profanity by a faculty member in the course of his teaching was undesirable because it would lower the "esteem" of the institution. The majority indicates that we must defer to school officials in "all but the most sensitive constitutional areas." *Ante* at n. 4. I fail to see a more sensitive constitutional area, however, than an individual's first amendment rights. The majority's citations from various Supreme Court cases do not convince me that their position is correct.

The largest problem in my view with the majority's extension of cases like *Bethel* and *Pico* is that the majority does not give sufficient weight to the differences between the high school instructional setting involved in the cases it cites, and the college instructional setting involved in this case. The purpose of education through high school is to instill basic knowledge, to lay the foundations to enable a student to learn greater knowledge, and to teach basic social, moral, and political values. A college education, on the other hand, deals more with challenging a student's ideas and concepts on a given subject matter. The college atmosphere enables students to rethink their views on various issues in an intellectual atmosphere which forces students to analyze their basic beliefs. Thus, high school is necessarily more structured than college, where a more free-wheeling experience is both contemplated and needed. What might be instructionally unacceptable in high school might be fully acceptable in college.

Consequently, the standard for examining statements in a high school setting such as that involved in *Bethel* should not necessarily be the same as in a college setting such as Midland. The fact that the maturity level of college students is higher than high school students is one factor to consider. In addition, it is worthy to note that attending college is voluntary while attending high school is mandatory. Young adults attend college expecting to be exposed to new views and ideas, including ones that do not mesh with their exist-

ing beliefs. In the case at hand, it appears that the students in Martin's economics class voluntarily chose to take his class, and may have voluntarily selected him as their teacher as well. It is possible, for example, that the students could have changed teachers or classes if they were dissatisfied with Martin's performance. *Cf. Pacifica,* 438 U.S. at 748 n. 27, 98 S.Ct. at 3040 n. 27, 57 L.Ed.2d at 1093 n. 27 ("Outside the home, the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker, requiring the offended listener to turn away.").

I do not decide the scope of *Bethel, Pacifica* and *Pico.* Unlike the majority, however, I do not think that these cases as written are applicable to a university setting. Furthermore, I believe that this case can be properly disposed of on the basis of *Connick.*