Keith DAMBROT, Lakeith Boyd, Leonard Bush, Marcus Culbreth, Deshanti Foreman, Keith Gilmore, Tyrone Hicks, Amere May, Plaintiffs,

v.

CENTRAL MICHIGAN UNIVERSITY, Leonard Plachta, Russel Herron, David Keilitz, Defendants.

No. 93–CV–10117–BC.

United States District Court, E.D. Michigan, N.D.

Nov. 26, 1993.

1993, following oral argument, the Court denied the motion from the bench in light of its ruling in favor of defendants.

James Schuster, Southfield, MI, for plaintiffs.

Robert M. Vercruysse, Detroit, MI, Steven W. Martineau, Mt. Pleasant, MI, for defendants.

## MEMORANDUM OPINION AND ORDER

CLELAND, District Judge.

### I. Background

This case presents to the Court a First Amendment challenge to Central Michigan University's "discriminatory harassment policy" and a dispute over the university's decision to not renew the employment contract of its basketball coach. Plaintiff Keith Dambrot was the head basketball coach at Defendant Central Michigan University ("CMU"). Unlike the coach, most of the members of the team (and one of the assistant coaches) are black. On at least one occasion during the

1992–93 season Dambrot used the word "nigger" in a talk he gave to the players and coaching staff, addressing several players, both black and white, and one assistant coach, by the term.[1] Dambrot testified that he intended to use the term in a "positive and reinforcing" manner during this closed-door locker room team session. There is absolutely no evidence to the contrary. Several black members of the team testified that they use the term commonly to refer to others of their race. Mr. Dambrot testified that it was his belief that the term had a positive meaning, knowing the context in which the players used the term amongst themselves; he used the term, he says, to connote someone who is "fearless, mentally strong, and tough." Plaintiffs' Supplemental Memorandum of Law on the Merits, p. 2.

Dambrot's use of the term eventually became known to certain individuals outside of the basketball team. At the request of Dambrot, Dave Keilitz, the athletic director at the university, interviewed members of the team in February, 1993. All of the black players informed him that they were not offended by their coach's use of the term. Sometime after that interview, a young man who had left the team the previous fall complained to the university's affirmative action officer of Dambrot's use of the word, claiming that he had been there during the incident.[2] The affirmative action officer confronted Dambrot, who admitted to using the term, though in a positive manner. The officer expressed to Dambrot her opinion that the term was incapable of being used positively and that, in any case, its use was a violation of the university's "discriminatory harassment policy." After the officer recommended that Dambrot be disciplined, and Dambrot acquiesced in lieu of a more formal investigation, he was suspended without pay for five days.

Soon after Dambrot's suspension, news of the incident spread throughout the university community. Dambrot granted an interview to the student newspaper, and an article was printed in which he told his side of the story. His statement appears to have been considerably more explanatory and defensive than apologetic in tone, and for this or other reasons some students were motivated to express indignation that Dambrot had used the term at all. A student demonstration was staged, and accounts of a "racial incident" at the university were spread through the local, regional, and national news media. On April 12, 1993 the athletic director informed Dambrot that his appointment as head coach would not be renewed for the 1993–94 season. The university contended then, and in court, that it had determined Dambrot to be no longer capable of effectively leading the men's basketball program.

The Plaintiffs began this lawsuit on April 19, 1993. Dambrot alleges that his employment was terminated because he used the term "nigger," and that the termination violated his First Amendment rights to free speech and academic freedom. He has also brought claims for violation of his due process rights, violation of the Elliott–Larsen Civil Rights Act and for defamation.[3] Several members of the basketball team have

---

**1.** According to testimony from some of the players and assertions of plaintiff's counsel at oral arguments, there is some confusion about the actual language used. The term may have been "nigger," a word pronounced with a concluding "r" sound and commonly thought of as insulting ... "a racial epithet" or "racial slur," as defendants cast it in their representations to the Court and the public. It may also have been something like "nigga" or "niggah," a pronunciation which carries with it a much different, and non-insulting, connotation especially when used by blacks themselves. The disposition of this case makes it unnecessary for the Court to determine with finality which of these is more likely true. While the Court will use the more common spelling— "nigger"—as all parties have done in written pleadings, the Court assumes for this Opinion the

accuracy of the plaintiff's protestations that he spoke the word, and intended it to be taken, with all positive connotations ... as though it had been pronounced "niggah" by one familiar with that usage.

**2.** The defendants contend that there is evidence of more than one such incident, the first of which occurred while the complaining party was still a team member.

**3.** He and the defendants stipulated to dismiss, without prejudice, the defamation count in order that limited discovery could proceed focused upon the motions at issue herein. The Court has withheld action on the stipulated dismissal, and the effect has been to defer action on that count.

joined the lawsuit alleging violations of their First Amendment rights as well.

The court granted in part and denied in part plaintiff's motion for preliminary injunction on June 17, 1993. The portion of the motion that was granted enjoined the university from enforcing its discriminatory harassment policy. Plaintiffs now seek summary judgment on plaintiffs' claims 1) that CMU's discriminatory harassment policy is facially unconstitutional and 2) that First Amendment interests were impinged when the discriminatory harassment policy was applied to Dambrot's termination. Defendants seek summary judgment on 1) plaintiffs' First Amendment claim and 2) plaintiffs' Fourteenth Amendment claim and 3) the individual defendants' claim of qualified immunity.

For the reasons expressed in this opinion, the Court GRANTS summary judgment in favor of plaintiffs with respect to the challenge to the facial unconstitutionality of the CMU discriminatory harassment policy, and will permanently enjoin the defendant university from further enforcement of such policy. The Court GRANTS summary judgment in favor of defendant university with respect to plaintiff's wrongful termination claim. Finally, the Court GRANTS summary judgment in favor of defendants with respect to plaintiff's Fourteenth Amendment claim.

## II. Standing

The defendants question whether certain of the plaintiffs possess legitimate standing to bring the instant action. Defendants answer the complaint by contending that the "student plaintiffs do not have standing to seek injunctive relief ... as they have not sustained and are not immediately in danger of sustaining some direct injury.... [nor do they have standing] to challenge the university's decision to terminate Dambrot's employment." (Defendant's Answer, Affirmative Defenses, ¶s 3–4).

The Court recognizes that a party "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others." *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 167, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627, 634 (1972) (guest who had never applied for membership lacked stand-

ing to challenge discriminatory membership policies, but had standing to challenge policy with respect to service of guests); *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326 n. 7, 33 L.Ed.2d 154, 164 (1972).

Dambrot, of course, easily meets the standing requirements as to the entire suit. The Court finds that the other plaintiffs, as team members, have standing limited to portions of the claims raised here. These players, who are also students at the university, have standing to challenge the constitutionality of the discriminatory harassment policy on its face since they might be subjected to it such that "the challenged conduct ... threaten[s] to cause a direct injury." *Doe v. University of Michigan,* 721 F.Supp. 852, 859 (E.D.Mich.1989). However, they lack standing to challenge Dambrot's termination. Although the team members may be "affected," in some sense, by Dambrot's termination—he would no longer be in a position to coach or "mentor" them, for example, and they would therefore no longer receive any of the benefits that might flow from his guidance—they would not be *directly* affected. *See, Moose Lodge, supra.* Those who stand to be directly harmed by the conduct are given a voice in the courts so that those most affected by the conduct will be heard unobscured by the voices of the far larger number of those tangentially affected. These determinations do not affect the vitality of any of the counts themselves, since there is at least one proper party as plaintiff in each.

## III. Summary Judgment Standard

Summary judgment is proper only where the moving party shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In the "new era" of summary judgment analysis, the Court is required to ask "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). The party opposing summary judgment must present "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 1479, citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. First Amendment Facial Challenge

### A. Overbreadth

In order for a statute to be found unconstitutional on its face on overbreadth grounds, 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *Leonardson v. City of East Lansing*, 896 F.2d 190, 195 (6th Cir.1990).

The CMU policy at issue seeks to prevent the following:

any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by (c) demeaning or slurring individuals through ... written literature because of their racial or ethnic affiliation; or (d) using symbols, epitaphs [sic][4] or slogans that infer negative connotations about an individual's racial or ethnic affiliation. [Plan for Affirmative Action at Central Michigan University, Section III(b)(1), Racial and Ethnic Harassment].

The policy appears to have been drafted to include as much within its ambit as possible, and its language is sweeping indeed. With guns trained on "*any ... behavior*" either "*verbal or nonverbal, ... intentional [or] unintentional,*" it seems to have covered the waterfront. All possible human conduct having thus been captured by this language, the only additional feature needed for a violation is that the "behavior" be such as to "subject[ ] an individual to an ... offensive ... environment" of some kind (including "living" which, similarly, covers a lot of territory). The measure for what "subjects" a person to "an environment" seems to the Court hazy at best, and indeed was described by university witnesses (including its president and its affirmative action officer) somewhat cryptically as behavior which a person "feels" has affronted either him or some group, predicated on race or ethnicity.[5]

The university several times argued, albeit half-heartedly, that the policy was not a "speech code" and was not equivalent to an ordinance or statute since it contains no real penalty mechanism. The Court finds such arguments disingenuous. The introduction to the salient section of the policy states:

Regardless of whether the courts and statutes have declared these actions unlawful, the University has declared them to be a violation of University policy: ... Discriminatory harassment, whether or not it rises to a level of legally forbidden discrimination." [Plan for Affirmative Action at Central Michigan University, Section III. Discriminatory Harassment].

Punctuating this declaration outlawing acts which are legal in society, the affirmative action officer, in her March 30, 1993, memorandum summarizing her "Grievance Investigation," concluded with specific "Recommended Actions for Resolution." These included discipline for Dambrot involving suspension and a threat of "more severe disciplinary action" in the future should Dambrot or his staff or players not "refrain from such language." She also prescribed what plain-

---

4. This word, meaning an inscription upon a grave or tomb, is found in the policy itself and has been used fairly often in pleadings and oral argument by at least one of the attorneys in this case. The Court presumes that the word "epithet"—an insult—is intended both in the policy and the comments of counsel.

5. The University stated much the same position in a letter dated May 4, 1993, [Hearing Exhibit 503] in which the president said that the "Affirmative Action Plan will continue to be used ..."

when complaints are received from "students, faculty or staff who feel they have been subjected to racial, ethnic or sexual discrimination." It appears to be the university's position, from the letter and from testimony, that when offending language is found it is labeled "conduct" and subjected to penalty: "... conduct, including verbal conduct, which creates a ... hostile work or educational environment ..." is "unacceptable." See also note 7, *infra.*

·tiff's counsel accurately identified as "sensitivity training" for everyone on ethnic terminology, such training to be conducted at the university's expense by an affirmative action officer from another institution.

The Court finds that, in spite of the absence of specific and predictable sanctions within the policy, there is unrefuted evidence showing a pattern of alleged policy violations being followed by investigation and enforcement sufficient to bring this supposedly benign policy well within the range of court review for constitutionality.

Is there a "realistic danger" of this policy compromising First Amendment protections? It is not much of a stretch to imagine a treatise, (or a student's term paper or even a cafeteria bull session) which explores the source of conflict among residents of some middle-eastern region and posits that one tribe. involved in the conflict is the more blameworthy due to some ancient ethnic traditions which give rise to barbarian combativeness or a long-standing inability to compromise. When and if it were complained of, would such a treatise (or term paper or conversation) be judged to violate the CMU policy since it potentially "demeans" or "slurs" various individuals "because of their racial or ethnic affiliation?" It would seem to be a good fit with the policy language. According to the policy, it is of no import that the author or speaker was speaking in good faith about a plausible thesis, nor that he was not *intending* to refer to any particular individual, either on or off CMU's campus. *Any* behavior, even unintentional, that offends [6] *any* individual is to be prohibited under the policy. The spirit in which the words are spoken is of no moment to this policy. The intent to inform rather than harm is irrelevant. If the speech gives offense it is prohibited [7].

The Court could, of course, explore many examples of speech on matters of public concern, politics, etc., but will not do so. It suffices to say that speech which enjoys fundamental first amendment protection can be effectively suppressed by the policy at issue. On its face this policy is overbroad. *Leonardson, supra.*

As stated in *Doe v. University of Michigan,* 721 F.Supp. 852, 863 (E.D.Mich.1989), and equally applicable here:

> What the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed.... Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people.... These principles acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission. *Id.*

Also, as noted by this District in *Doe,* "[t]he Supreme Court has consistently held that statutes punishing speech or conduct solely on the grounds that they are unseemly or offensive are constitutionally overbroad." *Id.* at 864. The policy at issue here goes even beyond suppressing "offensive" speech and suppresses "negative connotations" that are "unintentional." The policy instituted by CMU is even more overbroad than the U of M policy struck down in *Doe,* and, for that reason, all the more improper.

### B. Fighting words

#### 1. Content Limitations

CMU has attempted to categorize the policy's prohibitions as addressing only "fighting

---

**6.** The Court knows that the policy doesn't precisely say "offends." The policy consumes the additional paper and ink to target speech which "subjects [someone] ... to a hostile ... living environment...." No one has suggested that there is any difference between "subjecting" someone to "a hostile environment" and "offending" him.

**7.** The Court is emphatically unimpressed with the mid-stream letter "To the University Community" authored on May 4, 1993, by the universi-

ty's president. His letter declaims that the policy was not intended to be enforced, and would not be enforced, in such a way as to "interfere impermissibly with individuals' rights to free speech." The university defendant, with that, says in essence "trust us; we may interfere, but not *impermissibly*." The Court is not willing to entrust the guardianship of the First Amendment to the tender mercies of this institution's discriminatory harassment/affirmative action enforcer.

words." This, however, even if it were true, would not save the policy. *R.A.V. v. St. Paul*, 505 U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).[8] Such a policy, construed to reach only "fighting words," contains limitations on content and viewpoint which would render it facially unconstitutional. *Id.*:

> Although the [ordinance is limited] ... to reach only those symbols or displays that amount to 'fighting words,' the remaining, unmodified terms make clear that the ordinance applies only to 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion, or gender.' Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use 'fighting words' in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit ... special prohibitions on those speakers who express views on disfavored subjects. *R.A.V.*, 505 U.S. at ——, 112 S.Ct. at 2547, 120 L.Ed.2d at 323.

Just as in *R.A.V.*, the CMU policy confines its purpose to particular topics: race and ethnicity. Fighting words having to do with other, non-targeted topics may be used *ad libitum* on campus no matter how vile or harmful to the proper conduct of the university's educational mission. It therefore imposes upon a speaker the kind of "special prohibitions" mentioned in *R.A.V.* because he has spoken on an officially condemned topic.

### 2. Viewpoint Limitations

The Supreme Court in *R.A.V.*, identified constitutional problems beyond the content limitations on speech within the ordinance:

> In its practical operation, moreover, the ordinance goes even beyond mere content

discrimination, to actual viewpoint discrimination. Displays containing some words—odious racial epithets, for example—would be prohibited to proponents of all views. But 'fighting words' that do not themselves invoke race, color, creed, religion, or gender-aspersions upon a person's mother, for example—would seemingly be usable ad libitum in the placards of those arguing *in favor* of racial, color, etc. tolerance and equality, but could not be used by that speaker's opponents. *R.A.V.*, 505 U.S. at ——, 112 S.Ct. at 2547, 120 L.Ed.2d at 323 (emphasis in original).

The CMU policy similarly attempts to limit viewpoint. The policy prohibits use of "symbols, epitaphs [sic] or slogans that infer *negative* connotations about an individual's racial or ethnic affiliation" (emphasis added). *Negative* racial connotations are prohibited, but *positive* (or at least non-negative) connotations, based on those same racial or ethnic affiliations, are allowed. A campus speaker may thus go on at length recounting what he supposes to be the ethnic attributes of, for example, the Irish. So long as he speaks in a way which appears, from the viewpoint of the university's enforcers, to be either positive or neutral, the speaker is on safe ground so far as university policy is concerned. That speaker's tally of ethnic attributes, though, would be the *only* viewpoint allowed to be heard on the CMU campus[9], because all speakers with a differing view on that issue are prohibited by the policy from responding: in *their* words the speech police can "infer *negative* connotations about an individual's ... ethnic affiliation" or something "hostile" on those ethnic grounds. One can, of course, remove "Irish" and substitute the "ethnic or racial affiliation" of one's choice in this example.

> " 'If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expres-

---

8. the ordinance at issue in *R.A.V.* read as follows: Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender com-

mits disorderly conduct and shall be guilty of a misdemeanor. *R.A.V.*, 505 U.S. at ——, 112 S.Ct. at 2541, 120 L.Ed.2d at 315.

9. Unless perhaps, another speaker wanted to add something complementary which Speaker One forgot to mention.

sion of an idea simply because society finds the idea itself offensive or disagreeable.' The First Amendment does not recognize exceptions for bigotry, racism, and religious intolerance or ideas or matters some may deem trivial, vulgar or profane." *Iota Xi Chapter of Sigma Chi v. George Mason Univ.*, 773 F.Supp. 792, 795 (E.D.Va.1991), quoting *Texas v. Johnson*, [491 U.S. 397 at 412] 109 S.Ct. [2533] at 2544 [105 L.Ed.2d 342 (1989)].

The expanse of the suppression of speech made possible by this CMU policy is as remarkable as it is illegal.

### D. Vagueness

■ The policy is also constitutionally void for vagueness.

Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement. *Leonardson*, 896 F.2d at 196.

In the instant case, both problems—fair notice, and unrestricted delegation—are present. First, a person of ordinary intelligence would have to guess at the meaning of the prohibition. *Id.* The terms "offensive" and "negative" require subjective reference in order to define them; the meanings of these terms are as vastly divergent as are individual tastes and personalities. The difficulties experienced in trying to subjectively define and prohibit speech which is "offensive" become quite evident in the facts of this very case. First the reactions of the black players who testified and those whose statements were recounted in the hearings preceding this Opinion: at the interview Keilitz conducted in February, 1993, none of the players thought the term was used by their coach in a negative way. Keilitz himself may or may not have been offended, although he testified that he wouldn't have chosen to talk in that way to his own players when he was coaching. Then in March, one former player, Shannon Norris, decided that he *was*

offended, and he complained about it. This prompted an investigation by the affirmative action officer. *She* was offended. Consequently, the media and public also reacted in several ways, from outrage to complacent understanding, with many variants in between, so some of them appeared to be offended, and some not. The facts of this case exemplify the vast diversity of reaction to speech which is *potentially* offensive. For a person, even one as perceptive and intelligent as the average college student or professor, to accurately guess what a listener's reaction will be to something *potentially* offensive is nigh on impossible. Emphasizing this conclusion, the Court recalls that at the preliminary injunction hearing, when asked to specify what kind of conduct would constitute a "hostile environment," the university's own President, Dr. Leonard Plachta, was utterly incapable of defining the terms of the policy. With the leader of the university unable to describe the boundaries of prohibited speech under his own policy, it becomes a daunting task for defendants to argue that the policy provides "fair notice of the standard of conduct to which a citizen is held accountable." *Leonardson, supra.* The policy's prohibition is vague.

This imprecision also "invites arbitrary, discriminatory and overzealous enforcement" in its application. *Id.* It leads to certain kinds of offensive conduct being restricted while allowing other personally offensive conduct to go unrestrained, because for the definition of its terms it depends on the viewpoint of those in charge of the affirmative action policy, the enforcement officers. Id. Although not crucial to the Court's determination of this issue, the Court is confident that a careful examination of the history of Dambrot's censure for these locker room comments would reveal an example or two of what the Supreme Court meant by "overzealous enforcement" of a "vague policy."

Summary judgment is appropriate because there are no issues of fact as to the literal content of the policy and plaintiff is entitled to judgment as a matter of law. *Matsushita, supra.*

## V. First Amendment as Applied to Plaintiff

At oral argument and in the briefs, plaintiff relied on the following sequential analysis: (1) CMU's policy is unconstitutional because it suppresses speech that is protected by the First Amendment; (2) Plaintiff Dambrot was sanctioned pursuant to the policy and eventually terminated from employment as a result of such sanctioning; (3) therefore, plaintiff's termination was wrongful as violative of the First Amendment.

This argument is not bereft of logic; however, it misses a nuance in the required analysis which is indispensable. In order for Plaintiff Dambrot to have been harmed by the overbreadth of an improper policy, it must first be shown that his speech was protected by the First Amendment. If plaintiff's speech was not so protected, then the policy's overbreadth did not affect him. The suppression of protected speech identifies unconstitutional overbreadth in the first instance. If there is speech, but of a sort which was not constitutionally protected, the possible error of a policy would be harmless as to the speaker.

### A. Analysis under *Connick*

■ The courts have fashioned a very specific step-by-step analysis with respect to a claim by a public employee that the employee was terminated for constitutionally impermissible reasons. A public employee is required to show (1) that his speech was on a matter of public concern, (2) that if it was, then it was entitled to protection (after a balancing test is applied), and (3) that any first amendment violation was a substantial factor in termination. See, *Connick v. Meyers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Martin v. Parrish*, 805 F.2d 583 (5th Cir.1986); *Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir.1988).

The threshold question—whether the speech was of a public concern—must be answered in the affirmative in order for a plaintiff to show that his speech was entitled to First Amendment protection. He must also show, on the instant facts, that he was affected or harmed by the overbreadth of the defendant's policy.

If the Court were to begin at step 3, there is little doubt that plaintiff's speech could be viewed as a factor, probably even a "substantial factor," in the university's decision to terminate him from employment.[10] However, the Court may not ignore precedent and skip steps 1 and 2 of the analysis, since the analysis is sequential. If plaintiff's evidence cannot satisfy the requirements of step 1, plaintiff can not proceed to step 2[11], let alone to step 3.

### B. "Public Concern"

Plaintiff contends, and the Court agrees, that "although at-will Government employees may be fired with or without reason, they may not be fired for exercising their constitutional rights." *McMullen v. Carson*, 754 F.2d 936, 938 (6th Cir.1985). From this, Plaintiff Dambrot argues that the question is very simple: was he fired for the constitutionally impermissible reason that he exercised his first amendment right of free speech?

The question, the Court believes, is not quite so simply stated. The true "threshold question ... is whether [the employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Matulin*, 862 F.2d at 612, citing *Rankin*, 483 U.S. at 382, 107 S.Ct. at 2896–97, quoting *Connick*, 461 U.S. at 146, 103

---

10. The Court notes that Defendant has consistently argued that it had other reasons to terminate Plaintiff's employment.

11. The affirmative action officer cited in her memo to Keilitz a belief that language such as plaintiff's, were it displayed "on the front page" would cause great embarrassment to the university. But, there is little doubt that if plaintiff's speech *had* addressed a matter of public concern, plaintiff's interest would outweigh the University's interest:

Here not only was the perceived threat of disruption only to external operations and relationships, it was caused not by the speech itself but by threatened reaction to it by offended segments of the public ... [W]e think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech. *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir.1985).

S.Ct. at 1689. "If the offending speech does not bear upon a matter of public concern, 'it is unnecessary for us to scrutinize the reasons for [the] discharge.'" *Martin,* 805 F.2d at 584.

> The Supreme Court prescribed the method for determining when a public employee's speech addresses a matter of public concern. The trial court must make this determination, as a matter of law, on the basis of 'the content, form, and context of a given statement, as revealed by the whole record.' *Connick* also reaffirmed that if any part of the speech of an employee that contributes to the discharge relates to matters of public concern, the trial court must conduct a *Pickering* balancing of interests. *McMurphy v. City of Flushing,* 802 F.2d 191, 197 (6th Cir.1986).[12]

"Public concern" has been described by the Supreme Court in this context as follows:

> When employee expression cannot be fairly considered as *relating to any matter of political, social, or other concern to the community,* government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amend-

ment. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689 (emphasis added).

This is a question of law, one for the court to decide. *Hildebrand v. Board of Trustees of Michigan State University,* 662 F.2d 439, 442 (6th Cir.1981).

Application of the definition to the facts of various cases is a challenging task.[13] The Court has found no earlier reported case which is essentially identical to the issues involved in the instant case, but an analogous case was considered by the Fifth Circuit. In *Martin v. Parrish, supra,* plaintiff Martin was fired for what his employer considered to be incessant use of profanity in his college classroom. In finding that his speech did *not* touch a matter of public concern, the court stated:

> There is no doubt that Martin's epithets did not address a matter of public concern ... In highly derogatory and indecent terms, Martin implied that the students were inferior because they were accustomed to taking courses from inferior part-time instructors at Midland College. The profanity described Martin's attitude toward his students, hardly a matter that, but for this lawsuit, would occasion public

---

**12.** The Court in *McMurphy, supra* distinguished between an employee's remarks made in furtherance of a "personal vendetta" which were "clearly insubordinate and served no public purpose" and statements which, if made sincerely, would relate to a matter of public concern. *McMurphy,* 802 F.2d at 197–198. Statements made for the purpose of exposing corruption could be considered to concern the public, but those made as a personal criticism of his boss could not. *Id.*

**13.** Courts have found speech to address a public concern where the speech involves:

(a) complaints of malfeasance in a public work place: *Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988) (civilian employee of state police department made complaint to reporter that she was being retaliated against because of racial animus in department; her complaint was a matter of public concern); *Vasbinder v. Ambach,* 926 F.2d 1333 (2d Cir.1991) (complaints about potential fraud and theft from public funds is matter of public concern); *Breuer v. Hart,* 909 F.2d 1035 (7th Cir.1990) (statement about wrongdoing or breach of trust was matter of public concern).

(b) political statements: *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499 (11th Cir.

1990) (act of walking out of meeting to show displeasure with employer's position on tax increase was matter of public concern); *Belk v. Town of Minocqua,* 858 F.2d 1258 (7th Cir.1988) (complaint that state law prohibited certain actions by officials was a matter of public concern); *Firefighters Ass'n, Dist. of Columbia v. Barry,* 742 F.Supp. 1182 (D.C.C.1990) (firefighter placing insulting bumper stickers on car was matter of public concern in context of on-going dispute in fire department).

Courts have usually found speech not to address a public concern where an employee speaks about one's own job without *directly* implicating malfeasance or making political statements: *Knowlton v. Greenwood Indep. School Dist.,* 957 F.2d 1172 (5th Cir.1992) (employee's complaints about working without pay when supplying meals at school board meeting was personal matter and not matter of public concern); *Dodds v. Childers,* 933 F.2d 271 (5th Cir. 1991) (teacher complaint about favoritism to other teacher not a matter of public concern); *Ezekwo v. N.Y.C. Health & Hospitals Corp.,* 940 F.2d 775 (2d Cir.1991) (complaint about low evaluation was personal and not a matter of public concern).

The cases cited and their annotations, along with dozens of others, were listed at C780 ALI–ABA 717, 793–797.

discussion: *Appellant has not argued that his profanity was for any purpose other than cussing out his students as an expression of frustration with their progress—to 'motivate' them*—and has thereby impliedly conceded his case under *Connick. Martin,* 805 F.2d at 585 (emphasis added).

Similarly, in the instant case plaintiff spoke using the term "nigger" for purposes which, from his expressed point of view, are akin to the motivation spoken of in *Martin.* The evidence can easily demonstrate; and the Court for this discussion assumes (as already stated) that the coach was intending to be motivational and that he thought he was permitted through circumstances or by specific agreement of the players to make use of such language in the locker room. The Court further assumes the truth of Dambrot's assertion that he was attempting to flatter some players by applying the term to them as they often did to themselves in his presence. He thought he would humiliate (or motivate) others by *withholding* the description from them (or by referring to them as only "half-nigger"). In these ways he was using their "street language" as shorthand to call their attention to enthusiasm and toughness on the basketball floor, or to their lack of it.

A coach's distress about the degree of aggressiveness shown by his players on the basketball court is a reasonable matter of concern, certainly, to the coach, but not the kind of question that is fairly cast as a "public" issue.

### C. Public or private forum not dispositive

First, the Court notes that the matter was discussed (as coaches usually do) behind the closed doors of the athletic center in a decidedly non-public place. Of course, the Court is well aware that, if an employee's speech is made on a matter of true public concern, it does not really matter whether it is made "in a public forum, or in a private conversation." *Jones v. Dodson,* 727 F.2d 1329, 1334 (4th Cir.1984), citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The

Court further acknowledges that there is no fundamental requirement that the speech at issue in this kind of examination take place in a public forum to be of "public concern." *Pilkington v. Bevilacqua,* 439 F.Supp. 465, 474–475 (D.R.I.1977) ("[Plaintiff] spoke out on matters of public concern and each of his criticisms would have been appropriate for expression in some public forum ... Certainly his criticisms do not lose the protection of the First Amendment by reason of their being prudently directed to his co-employees ... instead of to the public at large.").

Finally, the Court recognizes that not all speech taking place in such a public place automatically falls within that protected category. *Evans v. City of Indianola, Miss.,* 778 F.Supp. 333, 336–337 (N.D.Miss.1991), *aff'd,* 981 F.2d 1255 ("A public employee cannot transform grievances regarding internal department operations into matters of public concern by resorting to a public forum."), citing *Cox v. Dardanelle Public School District,* 790 F.2d 668, 672 (8th Cir.1986); *Grace v. Bd. of Trustees for State Col. & Univ.,* 805 F.Supp. 390, 393 (M.D.La.1992) ("The fact that a public employee chooses a public forum in which to state his essentially private concerns does not convert the private grievance into a matter of public concern.").

■ However, whether speech is made in a private or public setting may contribute to the determination that speech is of private or public concern. *Smith v. Martin,* 819 F.Supp. 733, 734 (N.D.Ill.1992) ("It is of course not essential to that conclusion that the public employee's speech must have taken place in a public forum, although the fact of [plaintiff's] having gone to the public media after the retaliation might well be taken into account in evaluating the public-concern nature of his grievance at an earlier stage."), citing *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Fiorillo v. U.S. Dept. of Justice, Bureau of Prisons,* 795 F.2d 1544, 1556 (Fed.Cir.1986) ("Expression at a public forum has traditionally been viewed as evidence that the subject of the employee's speech is of public concern.").[14]

14. *Cf., Saye v. St. Vrain Valley School Distr. RE– 1J,* 785 F.2d 862, 866 (10th Cir.1986) ("The

The Court thus believes that one way to evaluate the possibility of the "public concern" component in questioned speech is to imagine it being discussed in public. The political compulsion of public employees partially at issue in *Connick, supra,* the allegations of corruption noted in *McMurphy, supra,* and comments concerning the level of fire protection in a town discussed in *Brasslet v. Cota,* 761 F.2d 827 (1st Cir.1985), all can easily be envisioned as the subjects of heated disputation, with the contesting points of view hashing it out from soapboxes in the public square. It is considerably more difficult to imagine Coach Dambrot stepping up to the microphone and letting everyone know that his basketball players were expected to be "niggers" during games.[15] Therefore, the facts that Dambrot's speech was given in the particular words chosen, and made in the locker room for his players' *private* consumption, only add further support to the conclusion that, at least as to the "form and context" of it, his speech was not on a matter of *public* concern. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689–90; *Smith v. Martin,* supra.

The Court does not intend to conclude that a matter of public concern must encompass deep philosophy, or possess any substantial degree of intellectual content. However, it does seem clear that something more meaningful than a coach's individual desire for tougher play should be required.

### D. "Private concerns" v. "The marketplace of ideas"

The Court's conclusion is supported by the Seventh Circuit's decision in *Swank v. Smart,* 898 F.2d 1247 (7th Cir.1990). In *Swank,* a policeman was terminated from his employment in the town of Carthage, Illinois, for taking a seventeen-year-old college student for a ride on his motorcycle while on duty. The plaintiff policeman argued that his dismissal violated, among other things, his First Amendment rights to free speech

and association. In finding that the plaintiff's speech did not address a matter of public concern, the Court noted:

> The purpose of the free-speech clause and of its judge-made corollary the right of association is to protect the market in ideas, broadly understood as the public expression of ideas, concepts, imagery, opinions—scientific, political, or aesthetic—to an audience whom the speaker seeks to inform, edify, or entertain. Casual chit-chat between two persons or otherwise confined to a small social group is unrelated, or largely so, to that marketplace, and is not protected. Such conversation is important to the participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment. *Swank,* 898 F.2d at 1250–1251.

Similarly, in the instant case, the conversation between a coach and his players within the confines of the locker room, lacks relation to the marketplace of ideas. This result is not softened by the fact that the conversation may have been of serious import to its participants. *Id.* As reiterated by the Court in *Swank:*

> The conversation that took place between [plaintiff] and [student] on the motorcycle ride, a conversation idle or flirtatious in character, was too remote from the political rally, the press conference, the demonstration, the theater, or other market places of ideas to activate the guarantees of the First Amendment. *Swank,* 898 F.2d at 1251.

Just as the conversation on the back of a motorcycle in *Swank* was remote from the marketplace of ideas, so too is the conversa-

---

allocation of aide time among teachers is not a matter inherently of public concern. Moreover, [plaintiff] did not raise the aide issue in a public forum,... The circumstances in which the discussions here occurred indicate that [plaintiff's] speech ... was a mere extension of her dispute ...").

**15.** And, to make matters that much more troubling for this imaginary exercise, to be true to the facts developed in testimony the coach would have to add in his broadcast that he didn't want any of them to be "half-nigger," nor to be "niggers" at all in the classroom.

tion between Dambrot and his players.[16]

It seems to the Court that Plaintiff Dambrot may be urging that the very use of the word "nigger," because its use may qualify for First Amendment shelter under other circumstances, confers upon his locker room behavior some kind of constitutional significance. If this is the logic intended, it is spurious.

Perhaps removing the contentious word from the equation will clarify: examine the hypothetical complaint of another coach from another locker room, who simply tries to motivate his troops to go out and do battle "aggressively" on the basketball court and to be "fearless, mentally strong, and tough." The coach is fired for this approach because the public university had decided upon a non-combative philosophy as to its athletic programs, consistent with the passivist outlook of an important alumnus and private benefactor, C. Milquetoast. The coach sues, claiming that his First Amendment right to speak freely has been impinged. The university stipulates that he was fired for the "aggressive battle" speech, but says that the approach a coach takes with the players is *their* business to regulate, and not "a matter of public concern." This Court would sustain that position because in the absence of any political or social concern, government employers are entitled to exercise discretion "without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690. Addition of the word "nigger" into this setting does not so alter the content or context so as to elevate the speech to "public concern." *Id.; McMurphy,* 802 F.2d at 197.

Dambrot's use of the term apparently stirred the interest of the public (in the form of demonstrations and letters to the editor), but this does not vitiate the requirement that the actual speech itself—as opposed to speech or media coverage or general gossip *about* the speech—address a matter of public concern. "[W]hat is of general interest to the public is not necessarily of public concern for First Amendment purposes." *Koch v. City of Hutchinson,* 847 F.2d 1436 (10th Cir.1988). Thus, although the debate about a public university employee using a word so steeped in racially negative implications is almost certainly a matter of public concern now, the question about the original speech itself stands apart.

Had Dambrot been fired simply for saying "nigger" while describing his impressions of the history of racial politics in the university community, or had the penalty come from his use of the term only while he was trying to explain or extricate himself from criticism over his alleged *earlier* use of it in the locker room, in either such event he would far better be able to argue that he was, at that time, injecting himself into "the marketplace of ideas"—and speaking on a matter of public concern.[17] *Connick, supra,* 461 U.S. at 148, n. 8, 103 S.Ct. at 1691, n. 8; *Belyeu v. Coosa County Board of Education,* 998 F.2d 925, 928 (11th Cir.1993). In short, had he been doing almost anything with more intellectual content than encouraging basketball players with such terminology, he could more persuasively argue that the matter "relat[ed] to a [ ] matter of political, social, or other concern to the community." *Connick, supra.*

16. The result would be the same if the Court were to employ the Seventh Circuit's "point of the speech" test as well. *Linhart v. Glatfelter,* 771 F.2d 1004 (7th Cir.1985) (the point of the in-office remark about supervisor was not to raise an issue of public concern):

> [T]he *Connick* test does not consist in looking at what might incidentally be conveyed by the fact that an employee spoke in a certain way. The test requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern? Or was the point to further some purely private interest? *Linhart,* 771 F.2d at 1010.

17. Extending these "public concern" examples a final step, it is conceivable that someone in the coach's position could assert that he had used the term only in the course of a lecture to his players on his ideas of the relationship between race and athletic ability. Whether such ideas were valid or not, he would be in a better position to argue that the *expression* of them conferred "public concern" status. The Court need not decide this because the record is devoid of any such contention. Such an argument at this time would amount to a " 'retroactive embellishment' of little value in determining the First Amendment claim." *Grace v. Bd. of Trustees for State Col. & Univ.,* 805 F.Supp. 390, 393 (M.D.La.1992).

Plaintiff augmented his essential argument by proposing that the manner in which a coach motivates his players in a public university setting is *always* a matter of "public concern," but this argument must fail because it begs the question, and provides no analysis.[18]

There is no conclusion available from the evidence other than that a coach's disappointment with team play, and his attendant use of assertedly motivating language, was of private concern only—to him and perhaps to his players. It was not speech on a matter of public concern.

### E. Balancing of interests is not required

Since the Court finds that plaintiff's locker room discussion, even one which included the use of emotionally-charged words, was not speech on a matter of public concern, the Court may not proceed to balance the interest of the university against the interest of plaintiff. Neither may the Court inquire whether the plaintiff's speech was a "substantial factor" in the defendant's decision to terminate plaintiff's employment. The Court will scrutinize the reasons for termination no further. *Martin*, 805 F.2d at 584. Summary judgment is appropriate since there is no issue of material fact as to the words spoken by plaintiff, and the Court resolves this issue as a matter of law. *Matsushita, supra*.

### VI. 14th Amendment

Plaintiff admits that "[t]he fact that the employee is at-will is highly relevant to due process claims—the at-will employee may not challenge the non-renewal [of his contract] on substantive or procedural due process grounds—but is completely irrelevant to the employee's First Amendment claim." Pl. MSJ.Br., p. 19. Thus, it seems that plaintiff has conceded he has no 14th Amendment redress.

Although at the preliminary injunction hearing it was undisputed that plaintiff was an at-will employee, in his response to defendant's Motion for Summary Judgment, plaintiff argues for the first time that there is a question of fact as to whether he was at-will. Pl.Resp.Br., pp. 27–28. Plaintiff then goes on to argue that since he was not offered a hearing until after this suit was filed, his due process rights were infringed upon. Pl.Resp. Br., p. 28. Plaintiff provides no authority which states that he was entitled to a pre-termination hearing. To the contrary, "in the absence of some positive law, we do not read such a [pre-termination hearing] custom as a part of the bundle of rights which constitutive 'property right' in employment." *Meyers v. City of Cincinnati,* 934 F.2d 726, 731 (6th Cir.1991).

### VII. Summary and Conclusion

Because the court finds the defendant university's "discriminatory harassment" policy to be facially unconstitutional, the plaintiffs' motion for summary judgment on this question is GRANTED, and the defendant Central Michigan University is PERMANENTLY ENJOINED from enforcing said policy.

For the reasons stated herein, the defendants' motion for summary judgment is GRANTED and plaintiff's corresponding motion DENIED with respect to plaintiff's First Amendment and Fourteenth Amendment claims against the university and the individual officers of the university.

The Court does not reach the issue of qualified immunity of the various officers since it finds none of plaintiff's constitutional claims in these respects to have merit.

Plaintiff's state law claims of defamation for placing plaintiff in a false light and violation of the Elliott–Larsen Civil Rights Act [Mich.Comp.Laws § 37.2101, *et seq.*] remain unaffected by this opinion.

IT IS SO ORDERED.

---

18. Plaintiff calls to the Court's attention the special place accorded competitive athletics in the modern university, and the financial implications to the university of ticket sales and alumni support. Of course, these public relations and financial implications are some of the same concerns cited by the university in *support* of its decision that Dambrot should no longer be at the helm of this team.