In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2408

BUDDY BELL,

*Plaintiff-Appellant,*

*v.*

CHICAGO POLICE DEPUTY CHIEF JAMES KEATING,
CHICAGO POLICE OFFICERS CARLOS MOTA,
PATRICK MURRAY, AND THE CITY OF CHICAGO,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 754—**John W. Darrah**, *Judge.*

ARGUED JUNE 1, 2012—DECIDED SEPTEMBER 10, 2012

Before FLAUM, ROVNER, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* A Chicago ordinance criminalizes an individual's refusal to leave a scene when so instructed by a police officer when three or more individuals are engaging in disorderly conduct nearby. Buddy Bell was arrested under that ordinance, the enforcement of which he presently seeks to enjoin as

facially violative of the First and Fourteenth Amendments. The district court dismissed his claims, ruling that he lacked standing to sue for injunctive relief.

We hold that Buddy Bell may sue to enjoin the ordinance as facially unconstitutional. We also conclude that Chicago Municipal Code § 8-4-010(d) (hereinafter "Subsection D") substantially inhibits protected speech and is not amenable to clear and uniform enforcement. We partially invalidate the ordinance and reverse.

## I. Background

On January 7, 2008, Buddy Bell participated in a protest against Operation Iraqi Freedom on the corner of Dearborn Street and Jackson Boulevard in downtown Chicago. He, along with other protesters, held a banner that said, "End the war and occupation TROOPS HOME NOW." At the time, President Bush was at a luncheon at the nearby Union League Club.

One protester, Andy Thayer, entered the street carrying a large banner and, according to Chicago police, advanced on the Deputy Chief who was monitoring the area on a Segway. Thayer was arrested, handcuffed, and placed in a squadrol. Bell and two other protesters, their own banner in hand, began approaching the squadrol, also walking into the street. The police ordered the three men to get back on the sidewalk several times. They refused and began chanting, "Hell no, we won't go. Set him free." Chicago police again ordered Bell and the other protesters to get back on the sidewalk. They refused, and the police arrested them for disorderly

conduct. In particular, police arrested Bell pursuant to Subsection D, which criminalizes an individual's behavior when he "knowingly . . . [f]ails to obey a lawful order of dispersal by a person known by him to be a peace officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm." Chicago Municipal Code § 8-4-010(d).

A state court acquitted Bell of violating Subsection D. Subsequently, Bell sued various members of Chicago law enforcement and the City of Chicago in federal court for violating his First, Fourth, and Fourteenth Amendment rights, as well as for malicious prosecution and indemnification. *See* 42 U.S.C. § 1983. He ultimately dropped all but his indemnification claim against the City of Chicago. He presented his Fourth Amendment claims of false arrest and his malicious prosecution claim to a jury, which found in favor of the defendants. The jury returned three special verdicts. It found (1) that Chicago police had probable cause to arrest Bell for disorderly conduct under an ordinance of the City of Chicago; (2) that Chicago police lacked probable cause to arrest Bell for disorderly conduct under Illinois law; and (3) that Chicago police lacked probable cause to arrest Bell for obstructing a peace officer under Illinois law.[1]

---

[1] In relevant part, the district court instructed the jury that "[t]here is probable cause for an arrest if at the moment the

(continued...)

Bell's claims that Subsection D facially contravened the First and Fourteenth Amendments remained before the district court. He alleged unconstitutional overbreadth and vagueness, respectively. Bell moved for declaratory relief and a permanent injunction barring enforcement of Subsection D, which the district court denied. The district court then dismissed Bell's First and Fourteenth Amendment challenges to Subsection D, ruling that Bell lacked standing to apply for injunctive relief because he did not demonstrate a likelihood of future or repeat injury. Bell presently and timely appeals the judgment of the district court.

---

[1] (...continued)
arrest was made a prudent person would have believed that the plaintiff, Buddy Bell, had committed or was committing[] a crime. . . . [U]nder an ordinance of the City of Chicago a person commits disorderly conduct when he knowingly fails to obey a lawful order of dispersal by a person known to him to be a peace officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm. Under Illinois law a person commits disorderly conduct when he knowingly does any act in such an unreasonable manner as to alarm or disturb another and provoke a breach of the peace. Under Illinois law a person who knowingly obstructs the performance of one known to be a peace officer of any authorized act within his official capacity commits a Class A misdemeanor."

## II.  Discussion

We review a party's standing to pursue injunctive relief de novo, *see ACLU of Ill. v. Alvarez*, No. 11-1286, 2012 WL 1592618, at *5 (7th Cir. May 8, 2012), as we do challenges to a statute's constitutionality, *see United States v. Juarez*, 454 F.3d 717, 719 (7th Cir. 2006).

## A.  The District Court's Findings on Bell's Standing

An Article III court enjoys jurisdiction over a case only if the plaintiff demonstrates that he suffered an injury in fact, the defendant's actions caused the injury, and the remedy he seeks would redress his injury. *See Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Alvarez*, 2012 WL 1592618, at *5. When the plaintiff applies for prospective relief against a harm not yet suffered—or one he believes he will suffer again—he must establish that he "is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and [that] the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). Otherwise, he fails to allege an actual case or controversy before the court. *See* U.S. CONST. art. III, § 2, cl. 1.

As a general matter, a plaintiff who wishes to engage in conduct arguably protected by the Constitution, but proscribed by a statute, successfully demonstrates an immediate risk of injury. *See Alvarez*, 2012 WL 1592618, at *5. The existence of the statute constitutes the gov-

ernment's commitment to prosecute in accordance with it and, thus, a concrete prospect of future harm for one who would flout it. *Id.* (citing *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)). Accordingly, when a plaintiff expresses a credible intention to disobey a statute, a sufficient likelihood of injury exists, and a pre-enforcement challenge is appropriate. *See Alvarez*, 2012 WL 1592618, at *5 (citing *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). He need not wait to be arrested to bring suit for injunctive relief.

We distinguish claims where a statute criminalizes the plaintiff's conduct or desired conduct from those where the plaintiff seeks relief from the defendant's criminal or unconstitutional behavior. For the latter type of claim, the putative injury typically proves too remote or attenuated to sustain our jurisdiction under Article III. *See Lyons*, 461 U.S. at 105-06 (finding no standing to sue for injunctive relief where the plaintiff suffered an unconstitutional chokehold during a traffic stop, feared that he would endure a chokehold again, but did not allege that *every* police officer in Los Angeles *always* applied chokeholds or that the City itself ordered chokeholds as protocol); *O'Shea v. Littleton*, 414 U.S. 488, 494-99 (1974) (finding no standing to sue for injunctive relief where plaintiffs alleged discriminatory law enforcement and inferred future harm based on a pattern of past violative conduct, not the likely enforcement of a statute). The same logic obtains when a statute was or would have to be misapplied to justify

the plaintiff's arrest. In *Schirmer v. Nagode,* for example, protesters who opposed military recruitment organized to hand out flyers near a recruiting booth at the Taste of Chicago. 621 F.3d 581, 583 (7th Cir. 2010). When the protesters ignored the police's request to move to a designated protest zone and a later request to disperse, they were arrested pursuant to Subsection D. *Id.* The charges were ultimately dismissed, and the plaintiffs sued under Section 1983. We held that the plaintiffs lacked standing to facially challenge Subsection D or pursue injunctive relief because the law "c[ould not] fairly be read to prohibit peaceful protests of the sort [in which they were engaged]" and concluded that the police's "clear misuse of a law d[id] not provide a basis for a federal court to explore that law's facial constitutionality." *Id.* at 587-88. That is, we concluded that, whatever injury the plaintiffs suffered by virtue of their arrests pursuant to Subsection D and whatever damages to which they were entitled, *id.* at 583, a facial challenge and injunctive relief were inappropriate because the statute itself did not portend arrest and prosecution for peaceful protests. *Id.* at 588 ("These plaintiffs' experience appears, on this record, to be the result of an isolated misuse of the failure-to-disperse provision and indicates that they are not reasonably likely to face a future prosecution if section 8-4-010(d) is enforced according to its terms.").

In this case, the district court, applying *Schirmer*, denied Bell standing, finding that the circumstances of his arrest were indistinguishable from those in *Schirmer* and that he "ha[d] not demonstrated more than a wholly

speculative possibility of criminal consequences." We conclude, contrary to the district court's assessment, that the circumstances prompting Bell's arrest differ from those in *Schirmer*. The protesters in this case were not calmly holding a sign or distributing leaflets. They were shouting at police and advancing on a police vehicle. Regardless of the degree to which Bell participated in those activities, at least three other people did so, and he did not move as directed by a police officer. The facts of his case situate him squarely within Subsection D's scope, giving police probable cause to arrest him. Thus, unlike in *Schirmer*, law enforcement did not misapply the statute to arrest and prosecute him; *Schirmer*'s misapplication analysis cannot operate to reduce Bell's alleged fear of arrest to speculation or to deny him standing to seek injunctive relief or facially challenge the law.

### B. Bell Successfully Establishes Injury and Has Standing to Facially Challenge Subsection D as Overly Broad and Vague

Bell argues that Subsection D is constitutionally infirm because it is vague and overbroad, both of which, if true, are facial failings. The defendants insist, however, that despite the fact that Subsection D was not misapplied against Bell, he lacks standing to sue for injunctive relief and, by implication, to facially challenge the ordinance because he cannot demonstrate a concrete injury unless he intends to participate in a protest where three or more persons in his immediate vicinity are committing acts of disorderly conduct—behaving in such an

unreasonable manner as to provoke, make or aid in making a breach of the peace, *see* Chicago Municipal Code § 8-4-010(a) (defining "disorderly conduct"). They contend that his involvement in political protests, without more, is not proscribed by Subsection D, and his hope to participate in the future does not insure his arrest as necessary to confer standing for injunctive relief.

### 1. Overbreadth: Standing to Bring His First Amendment Claim

Facial invalidation typically requires that "no set of circumstances exists under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), so the remedy "*must* be injunctive and declaratory," *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (emphasis in original). Though it also demands injunctive and declaratory relief if successful, an overbreadth claim is unique from traditional facial challenges in that it does not require a plaintiff to plead or prove that the law is unconstitutional in every application. *See Ezell*, 651 F.3d at 698 n.8 ("Overbreadth claims are a distinct type of facial challenge." (quoting *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010))); *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) ("[T]he First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges." (quoting *Virginia v. Hicks*, 539 U.S. 113, 118 (2003))). Content-neutral regulations—laws that restrict expressive conduct for reasons unrelated to

the expression itself, *see Boos v. Barry*, 485 U.S. 312, 320 (1988)—suffer from overbreadth and necessitate facial invalidation if their unconstitutional applications against otherwise protected expression outnumber their legitimate ones. For such "technical overbreadth" claims, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 381 n.3 (1992) (defining "technical overbreadth" as "a claim that the ordinance violated the rights of too many third parties"), the question is one of magnitude. Where a sufficient imbalance exists, the statute proves facially invalid, not because it lacks any conceivable constitutional application, but because the "threat of [its] enforcement . . . deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 292 (2008). Technically overbroad statutes, in short, must fail because they unconstitutionally chill protected expression.[2]

---

[2] A law that suffers from "technical overbreadth" may be analytically distinguished from one that fails as substantively overbroad, meaning that it "restrict[s] more speech than the Constitution permits . . . because it is content based." *R.A.V.*, 505 U.S. at 381 n.3. The latter subset of overbreadth plagues regulations that target a category of subject matter or a particular viewpoint, *see, e.g., id.* at 382 ("The First Amendment generally prevents government from proscribing speech or even expressive conduct because of disapproval of the ideas expressed." (internal citations omitted)); *see also Stevens*, 130 S. Ct. at 1584 ("[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."

(continued...)

Chilled speech is, unquestionably, an injury supporting standing, *see Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995) ("Arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional right of free speech in order to avert those harms."); *see also Sec'r of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court."), but a plaintiff's notional or subjective fear of chilling is insufficient to sustain a

---

[2] (...continued)

(quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002))), where the government cannot demonstrate a compelling state interest in regulating that idea or achieve it through narrowly tailored means, *see Police Dep't of Chicago v. Mosely*, 408 U.S. 92, 94-95, 101-02 (1972) (explaining that laws that discriminate on the basis of message must prove "an appropriate governmental interest suitably furthered by the differential treatment"); *see also Boos*, 485 U.S. at 321 (noting that content-based restrictions are "subjected to the most exacting scrutiny" and, thus, must be narrowly tailored to meet a compelling state interest). When a content-based regulation fails strict scrutiny—and is, therefore, substantively overbroad—there exists no possible application of that law consistent with the First Amendment's guarantees. *See* KATHLEEN M. SULLIVAN & GERALD GUNTHER, CONSTITUTIONAL LAW 1093 (16th ed. 2007) (suggesting that overbreadth may be viewed as one application of strict scrutiny (citing Monaghan, *Overbreadth*, 1981 SUP. CT. REV. 1, 1081 (1982))).

court's jurisdiction under Article III, *see Laird v. Tatum*, 408 U.S. 1, 11, 13-14 (1972) (holding that where a defendant's chilling claims stemmed from government surveillance techniques and not a proscriptive regulation, "[a]llegations of a subjective 'chill' [were] not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). The plaintiff must substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief.[3] He does so where, for example, he challenges an "exercise of government power [that is] regulatory, proscriptive, or compulsory in nature, and [he] was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird*, 408 U.S. at 11; *see also Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1089

---

[3] This rule applies only where the plaintiff is alleging a chilling of *his own* protected speech as the injury in fact. Note, however, that where a plaintiff faced arrest under an allegedly overbroad ordinance, but was either not chilled or not engaging in protected expression, he could still facially challenge the statute on behalf of others whose protected expression would be hampered by the law. *See Munson*, 467 U.S. at 958 (noting that with respect to an overbreadth challenge, "a party [may] assert the rights of another without regard to the ability of the other to assert his own claims and with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)) (internal quotation marks omitted)); *Gooding v. Wilson*, 405 U.S. 518, 520-21 (1972) (same).

(10th Cir. 2006) ("We hold that plaintiffs in a suit for prospective relief based on a 'chilling effect' on speech can satisfy the requirement that their claim of injury be 'concrete and particularized' by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.").

Part and parcel of his overbreadth claim, Bell alleges both that his own speech has been chilled by Subsection D and that the ordinance might chill others from exercising their First Amendment rights. We conclude that he establishes a chilling injury sufficient to satisfy Article III standing. His past participation in a protest buttresses his representation that he wishes to participate in protests or assemblies in Chicago in the future, and his past arrest under Subsection D supports his claim that the enforcement of the ordinance has chilled his willingness to participate again. *Cf. City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 n.7 (1987) ("[The defendant's] record of arrests under the ordinance and his adopted role as citizen provocateur give him standing to challenge the facial validity of the ordinance."). Indeed, his past experience with the ordinance lends credibility to his assertion that the City will enforce Subsection D against individuals engaged in protected speech activities when certain triggering events occur.

Contrary to the City's argument, the fact that the ordinance applies only if triggered does not attenuate Bell's likelihood of prosecution under the statute or subvert the concreteness of his chilling injury. The putative vagueness surrounding those triggering events, *see infra* Part II.B.2, *compounds* his chilling claim: when one cannot know what triggers the ordinance such that it will be enforced, he may fairly assume that it can and will always be enforced and that total abstention from the protected activity is necessary to avoid arrest and prosecution. Bell successfully alleges a chilling injury, and we hold that he enjoys standing to sue for injunctive relief and facially challenge Subsection D as overly broad.

### 2.  Vagueness: Standing to Bring a Fourteenth Amendment Claim

A vagueness claim alleges that, as written, the law either fails to provide definite notice to individuals regarding what behavior is criminalized or invites arbitrary and discriminatory enforcement—or both. *See Skilling v. United States*, 130 S. Ct. 2896, 2927-28 (2010) ("To satisfy due process, 'a penal statute must define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.' The void-for-vagueness doctrine embraces these requirements." (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983))). Although it derives from the Fourteenth Amendment, a statute that is vague may implicate a plaintiff's First Amendment

rights, fostering those same chilling concerns that attend an overbreadth challenge. *See Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976) ("The general test of vagueness applies with particular force in review of laws dealing with speech. . . . [A] man may the less be required to act at his peril [where a statute has a potentially inhibiting effect on speech], because the free dissemination of ideas may be the loser." (quoting *Smith v. California*, 361 U.S. 147, 151 (1959))). In those instances when an imprecise law implicates speech and assembly rights, an injured plaintiff may also facially challenge a statute as void for vagueness. *See Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 154 n.2 (7th Cir. 1990) ("The first amendment 'chill' and its consequential injury . . . confer[] standing for an action based on a vagueness theory." (citing *Hynes*, 425 U.S. at 621 n.5)).

Bell argues that Subsection D fails both tenets of vagueness and, like the ordinance's overbreadth, precipitates a chilling injury. As used in the ordinance, he contends, the terms "serious inconvenience," "annoyance," and "alarm" vest unbridled authority in law enforcement such that one cannot know what conduct triggers Subsection D or whether the law is evenly enforced. As a result, he maintains, it is impossible for him to know whether a future assembly he wishes to attend will evince transgressing behavior from his fellow protesters, and, especially since he cannot control their behavior, he must abstain from all protests unless he wishes to risk prosecution under Subsection D. We conclude that Bell may, therefore, facially challenge Subsection D as unconstitutionally vague and sue for injunctive relief.

## C. First Amendment Challenge: Overbreadth

Facial invalidation for technical overbreadth is "strong medicine," *see New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)), and is inappropriately employed unless the statute "substantially" criminalizes or suppresses otherwise protected speech vis-à-vis its "plainly legitimate sweep*." See Williams*, 553 U.S. at 292-93 ("In order to maintain the appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." (emphasis in original)). We, therefore, begin by construing the ordinance to assess its overall reach and impact upon the First Amendment.[4] *Id.* In doing so, we must adopt any limiting construction proffered by a state court. *See Kolender*, 461 U.S. at 355. If Subsection D is "readily susceptible" to an interpretation that would preserve its constitutionality, we must uphold it, but we "will not

---

[4] We have already upheld as constitutionally sound the definition of "disorderly conduct" provided in Chicago Municipal Code § 8-4-010(a). *See United States v. Woodard*, 376 F.2d 136 (7th Cir. 1967); *see also Broadrick*, 413 U.S. at 613-14 (defending, as a general matter, the facial constitutionality of "disorderly conduct" or "breach of the peace" statutes). Bell challenges only the expounded definition in Subsection D, and we, thus, limit our review to the phrase in dispute: "which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm." *See* Chicago Municipal Code § 8-4-010(d).

rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988).

The Illinois Supreme Court has made clear that disorderly conduct statutes in the state, including Chicago's disorderly conduct ordinance, do not criminalize speaking. *See People v. Raby*, 240 N.E.2d 595, 598 (Ill. 1968) (holding, with respect to Illinois' disorderly conduct statute, that "under no circumstances would the statute allow persons to be punished merely for peacefully expressing unpopular views"); *see also In re B.C.*, 680 N.E.2d 1355, 1369 (Ill. 1997) ("Disorderly conduct statutes must be narrowly drawn or construed so that the statutes do not reach protected speech.").[5] Moreover, the Illinois Supreme Court has recognized that in enforcing disorderly conduct statutes, "the police may not stop a peaceful demonstration merely because a hostile crowd which does not agree with the views of the demonstrators threatens violence and, in fact, owe a duty to protect the peaceful individuals from acts of hostility." *See City of Chicago v. Weiss*, 281 N.E.2d 310, 315 (Ill. 1972). The Illinois Supreme Court consequently limits Subsection D to preclude a "heckler's veto." So

---

[5] The Illinois Supreme Court rightly maintains that disorderly conduct statutes could reach speech expressed through incitement, *see Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), fighting words, *see Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), or obscenity, *see Miller v. California*, 413 U.S. 15 (1973), which are modes of expression that are not protected by the First Amendment. *See B.C.*, 680 N.E.2d at 1369.

long as a speaker and his supporters refrain from acts of disorderly conduct, police may not order them to disperse when they are confronted by a hostile crowd.

In light of the Illinois Supreme Court's constructions, disorderly conduct does not refer to peaceful speech or assembly. The ordinance's triggering conduct cannot be an act constituting protected expression (e.g., picketing or leafleting) or aimed at disrupting protected expression. Nevertheless, Subsection D may still implicate protected expression because, once triggered, it may be applied to disperse people engaged in peaceful speech or expressive conduct, including on topics of public concern. *See, e.g., Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 600 (2008) (identifying speech on matters of public concern as at the core of First Amendment protection). The question, then, is whether the law *substantially* does so. *See Williams*, 533 U.S. at 292-93.[6]

---

[6] Expounding upon substantial overbreadth as a standard, the Supreme Court has stated, "The concept of substantial overbreadth is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. . . . In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds*." City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984). The Court's discussion of this standard underscores that both the

(continued...)

Per the plain language of the ordinance, law enforcement may order an individual to disperse when at least three others in his vicinity behave in a way that amounts to disorderly conduct "likely to cause substantial harm *or* serious inconvenience, annoyance *or* alarm." Chicago Municipal Code § 8-4-010(d) (emphasis added). The ordinance phrases these worrisome effects disjunctively, so police may order dispersal if any *one* of them is likely to occur as a result of the conduct.

### 1. Dispersal on the Basis of Likely Substantial Harm

It is well established that otherwise protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage. The Supreme Court has long held beyond First Amendment protection speech or association that incites its audience to imminent violence. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). So, too, speech or associa-

---

[6] (...continued)

numerosity of unconstitutional applications and the importance of the speech affected may inform the substantialness of a law's infirmity. *See* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW PRINCIPLES AND POLICIES 944-46 (3d ed. 2006) (citing Richard Fallon, Jr., *Making Sense of Overbreadth*, 100 YALE L.J. 853, 894 (1991)). For the conclusion that a finding of substantial overbreadth depends upon a court's implicit judgments about whether expression is protected and whether protected expression has been constitutionally regulated, *see* SULLIVAN & GUNTHER, *supra* note 3, at 1082.

tion that poses to a particular listener or group of listeners an unambiguous invitation to brawl. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942); *cf. Cohen v. California*, 403 U.S. 15, 22-24 (1971). And when, for whatever reason, immediate danger to speakers and protesters exists, the Court has held that speech may be curtailed to prevent a riot or serious bodily injury to those gathered. *See Feiner v. New York*, 340 U.S. 315, 321 (1951) (upholding law enforcement's right to interfere with protected expression when "faced with a crisis"); *see also Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949) (holding that protected speech may not be abridged or censored *short of* "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest"). When such conditions emerge, they bespeak dispersal as a necessary means of averting danger and damage, and the City may empower law enforcement to order people to disperse without unconstitutionally burdening free speech. In turn, law enforcement may arrest those individuals that refuse to leave when ordered, as their failure to comply exacerbates the danger afflicting the City and hinders law enforcement's ability to secure the situation. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. . . . [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or

substantial governmental interest; if the govern-mental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.").

If, as the Illinois Supreme Court assures, Subsection D cannot be triggered by peaceful or otherwise protected expression, then the logical corollary is that the substantial harm contemplated by Subsection D is physical danger or damage to the people and property nearby. *See* MERRIAM-WEBSTER DICTIONARY ONLINE, available at http://merriam-webster.com/dictionary (last visited August 2, 2012) (defining "substantial" as "real," "essential," or "considerable in quantity" and "harm" as "physical or mental damage"); *see also Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 799 (7th Cir. 2010) ("Dictionaries are a helpful resource in ascertaining the common meaning of terms that a statute leaves unde-fined."). Accordingly, to the extent that Subsection D authorizes dispersal when an assembly creates or is threatened by "substantial harm," it does not improperly infringe upon protected speech. We cannot say the same, however, for authorizing dispersal on the basis of "serious inconvenience, annoyance or alarm." Chicago Municipal Code § 8-4-010(d).

### 2. Dispersal on the Basis of Likely Serious Inconve-nience

The term "serious inconvenience," in the context of a disorderly conduct statute, likely envisions nuisances

such as the obstruction of public passages or amplified noise that are well within a city's power to regulate. *See* MERRIAM-WEBSTER DICTIONARY ONLINE, available at http://merriam-webster.com/dictionary (last visited August 2, 2012) (defining "serious" as "having important or dangerous possible consequences" and "inconvenience" as "not convenient, especially in giving trouble or annoyance"); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1986) (underscoring that a city is "free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct"). Chicago has identified and proscribed those serious inconveniences it finds problematic in its Municipal Code, authorizing law enforcement to penalize individual perpetrators when they commit a specific nuisance that compromises the City's safety and order. *See, e.g.*, Chicago Municipal Code § 10-8-330(b) (prohibiting all parades on public ways without a permit); § 8-32-070 (regulating music and amplified sound); § 8-4-055 (prohibiting sound-emitting devices audible to others on public conveyances); § 8-4-140 (prohibiting intentional injury to or obstruction of signal systems); § 8-4-065 (prohibiting the intentional interference with utility equipment); § 8-4-081 (prohibiting public urination or defecation). The City intends Subsection D to augment law enforcement's authority under the Municipal Code, empowering it to address inconveniences created by three or more individuals not only by confronting them, but also by dispersing anyone nearby—a tactic that pertains in equal force to individuals exercising

protected First Amendment rights. But unlike the Munici-
pal Code's treatment of nuisances, and likely in an
attempt to maximize flexibility and discretion for law
enforcement, Subsection D does not specify what incon-
veniences, if performed by three or more individuals,
may trigger an order to disperse. Nor does it clarify
that, whatever the inconvenience at issue, dispersal
must be necessary to confront the violation. To this end,
the ordinance lacks the necessary specificity and tailoring
to pass constitutional muster, and we must conclude
that the ordinance substantially impacts speech. *See
Broadrick*, 413 U.S. at 615.

The Supreme Court has held that when individuals
ordered to disperse or move along manifest a "bona fide
intention to exercise a constitutional right," a city may
criminalize their refusal only when its "interest so
clearly outweighs the [individuals'] interest sought to
be asserted that the latter must be deemed insubstan-
tial." *Colten v. Kentucky*, 407 U.S. 104, 111 (1972). A city's
interest prevails only if the nuisances at issue risk sub-
stantial harm or if dispersal is otherwise *necessary*
to address the violations and transgressors. *See Wash.
Mobilization Comm. v. Cullinane*, 566 F.2d 107, 118-19
(D.C. Cir. 1977) (considering an ordinance com-
manding "every person present at the scene of [a public
disturbance] [to] comply with any necessary order or
instruction of any police officer" and holding that the
word "necessary" limited "police discretion to the ac-
complishment of the specified and properly narrow
purposes of the regulation"). As the Court emphasized
in *Cox v. Louisiana*:

The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and *not susceptible to abuses of discriminatory application*, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.

379 U.S. 536, 553-55 (1965) (emphasis added). A law insuring public safety and security is not susceptible to abuses of discriminatory application when the behavior it targets is clear and the law enforcement action it authorizes is necessary to its success. Accordingly, law enforcement may disperse individuals present only when its ability to control public nuisances or obstruction demand that tactic. *Cf. Boos*, 485 U.S. at 330-32 (declining to find overly broad an ordinance criminalizing an individual's refusal to obey a dispersal order within 500 feet of an embassy because the law, as construed, permitted dispersal "only when the police reasonably believe[d] that a threat to the security or peace of the embassy [was] present"). Even if the term "serious inconvenience" were better defined, which it is not, permitting dispersal when a serious inconvenience may be alternatively controlled, as does Subsection D, does not meet this standard and improperly reaches otherwise protected expression. *Cf.*

*Leonardson v. City of East Lansing*, 896 F.2d 190, 197-98 (6th Cir. 1990).

### 3. Dispersal on the Basis of Likely Alarm

With respect to the undesirable effect of "alarm," we reiterate our conclusion in *United States v. Woodard* that this term is "conjugate with the term 'breach of the peace,' which may encompass the reaction of disturbance and alarm on the part of others." 376 F.2d at 141. We consequently understand "alarm" as conjugate with the term "disorderly conduct" as well. *See* Chicago Municipal Code § 8-4-010(a), (d); *see also supra* note 4. Generally, we avoid construing statutes "in a way that makes words or phrases meaningless or superfluous." *United States v. Chemetco, Inc.*, 274 F.3d 1154, 1160 (7th Cir. 2001) (quoting *United States v. Franz*, 886 F.2d 973, 978 (7th Cir. 1989)) (internal quotation marks and omissions omitted). As used in Subsection D, however, the term "alarm" cannot escape this fate. "Alarm" denotes "sudden apprehension and fear resulting from the perception of immediate danger." *See* MERRIAM-WEBSTER DICTIONARY ONLINE, available at http://merriam-webster. com/dictionary (last visited August 2, 2012) (defining "alarm"). The Illinois Supreme Court has clarified that, for purposes of our analysis, the immediate danger (disorderly conduct) one perceives as alarming may not be offensive ideas or language only; therefore, the disorderly conduct engendering the alarm at issue must be a corporeal disturbance to which a viewer may react. *See Woodard*, 376 F.2d at 141 (noting that actions provoke a

breach of the peace or amount to disorderly conduct when they are contrary to "ordinary human conduct" and "offend the mores of the community"). In other words, the alarmed response derives from conduct likely to result in substantial harm or serious inconvenience, as acts of this nature are those likely to manifest danger. The term "alarm" thus proves redundant, reiterating that law enforcement may criminalize a failure to disperse when confronted with the likely outcome of substantial harm or serious inconvenience. "Alarm" does not subsume within Subsection D any additional speech; the term renders Subsection D overly broad only to the extent that the terms "substantial harm" or "serious inconvenience" do so.

As we discussed, however, law enforcement may constitutionally order dispersal of those engaged in protected expression upon "serious inconvenience" only when dispersal is required to combat the specified nuisances before it. *See supra* Part II.C.2. Just as Subsection D lacks this circumscription with respect to dispersal orders on the basis of "serious inconvenience," so, too, with respect to dispersal orders on the basis of "alarm."

### 4. Dispersal on the Basis of Likely Annoyance

As for dispersal orders on the sole basis of "annoyance," Subsection D again cannot withstand constitutional scrutiny. Unlike conduct likely to elicit alarm, disorderly conduct likely to engender annoyance is not only those actions that cause substantial harm or serious inconvenience. The ordinary meaning of "to annoy," which is "to

trouble, to vex, to impede, to incommode, to provoke, to harass or to irritate," *Coates*, 402 U.S. at 613, compels this reading: not every annoying act gives rise to imminent danger or nuisance.

Avoiding annoyance is never a proper basis on which to curtail protected speech. *See Coates*, 402 U.S. at 615 ("The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people."). This precept is most obvious when the speech or assembly is the source of the annoyance because, as the Supreme Court emphasized in *Coates v. Cincinnati*, silencing otherwise protected speech because it annoys is tantamount to "suspending unconditionally the right of assembly and free speech." *Id.* at 616; *see also Terminiello*, 337 U.S. at 4 ("[A] function of free speech . . . is to invite dispute. . . . Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."). We do not diminish First Amendment protection when, per the Illinois Supreme Court's construction, speech or assembly is not the source of the annoyance in question. We cannot conceive of an annoying behavior, however annoying it may be, that could constitutionally draw as a remedy dispersing others engaged in protected speech. *Cf. Hill*, 482 U.S. at 465 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them.").

In sum, we hold that to the extent Subsection D permits dispersal orders against people exercising First Amendment rights (1) when those around them are likely to foster serious inconvenience or alarm, but dispersal is not integral to law enforcement's ability to control the nuisances, and (2) when they or those around them are likely to foster annoyance, the ordinance substantially encumbers protected expression vis-à-vis its legitimate scope. *See Broadrick*, 413 U.S. at 615 ("[T]he overbreadth of a statute must not only be real, but substantial as well."). While recognizing and respecting the City's need to protect its citizens and its streets, we conclude that the ordinance is overly broad.

## D.  Fourteenth Amendment Challenge: Void for Vagueness

Subsection D satisfies due process only if it "define[s] the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 130 S. Ct. at 2927-28 (quoting *Kolender*, 461 U.S. at 357). Having upheld as constitutional the ordinance's definition of "disorderly conduct," *see supra* note 4, we consider only whether the phrase "which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm" comports with due process' commands.

### 1. Sufficient Definiteness

The Illinois Supreme Court has clarified that conduct which Subsection D does not proscribe: failure to disperse when all that transpires is peaceful speech or assembly. *See In re B.C.*, 680 N.E.2d at 1369; *Raby*, 240 N.E.2d at 598. We must assess, however, whether the ordinance makes clear that conduct which *does* give rise to a lawful dispersal order such that an ordinary individual can understand when his failure to move is criminalized. As we do so, we consider not only the words of the ordinance, but also the context for which the statute is written. *See Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (noting that an ordinance's "particular context" may "give[] fair notice to those to whom it is directed" (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950))).

In the context of a disorderly conduct ordinance, the terms "substantial harm," "serious inconvenience," and "alarm" specify what types of disorderly conduct will trigger a lawful dispersal order. "Substantial harm," as we mentioned, signifies imminent property damage or violence. *See supra* Part II.C.1. An individual can understand that when the conduct of three or more people in the vicinity will likely result in the immediate destruction of property or physical injury, that conduct will trigger a dispersal order and his compliance is required.

Regarding dispersal on the basis of "serious inconvenience," the term, without further explanation or refinement, does not identify what nuisances amount to such inconvenience that First Amendment rights constitution-

ally give way to Subsection D's restrictions. *See supra* Part II.C.2. Without greater specificity, the ordinance denies individuals of common comprehension notice of the prohibited conduct. One lacks warning about the behavior that prompts a lawful dispersal order, and he cannot know when he must move along if so ordered by law enforcement.

The term "alarm," as used in Subsection D, remains coextensive with the terms "substantial harm" and "serious inconvenience." *See supra* Part II.C.3. Bounded by these effects, the term is superfluous and does not criminalize any additional behavior. Nevertheless, due to its symbiotic relationship with the terms "substantial harm" and "serious inconvenience," it suffers from whatever imprecision afflicts them. "Alarm," therefore, fails to advance notice to the extent that "serious inconvenience" fails to do so.

Finally, to the extent that the ordinance criminalizes one's refusal to disperse when proximate to disorderly conduct likely to annoy, it predicates penalty on an inscrutable standard, which is no standard at all. *See Coates*, 402 U.S. at 614. Assuming arguendo that annoying behavior may constitute disorderly conduct, *see Woodard*, 376 F.2d at 141 (noting that behavior that is simply "eccentric or unconventional" typically falls outside the bounds of disorderly conduct, "no matter how irritable to others"), reasonable people may disagree about what actions evoke this reaction. *See Coates*, 402 U.S. at 614 ("Conduct that annoys some people does not annoy others."). As a result, "[individuals] of common

intelligence must necessarily guess at [what it means to annoy].*" Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The ordinance, therefore, runs afoul of due process' first requirement, *see Skilling*, 130 S. Ct. at 2927-28, because individuals who wish to comply with Subsection D lack notice about what annoying conduct may legitimately invite a dispersal order.

### 2. Arbitrary or Discriminatory Enforcement

Subsection D may also be void for vagueness if it is susceptible to discriminatory or arbitrary enforcement. The ordinance fails this second criterion if it impermissibly delegates to law enforcement the authority to arrest and prosecute on "an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108; *see also Cox*, 379 U.S. at 555-56 (invalidating convictions for violating an ordinance prohibiting the obstruction of public passages because of the law's routine, discriminatory enforcement). We underscore, however, that a statute is not vague simply because it requires law enforcement to exercise some degree of judgment. *See Grayned*, 408 U.S. at 114. To the contrary, due process rejects "sweeping standard[s] [that] place[] unfettered discretion in the hands of police, judges, and juries to carry out arbitrary and erratic arrests and convictions." *Wright v. New Jersey*, 469 U.S. 1146, 1151 (1985) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)) (internal quotation marks omitted).

When law enforcement confronts a likelihood of "substantial harm," dispersal orders avoid this defect. Sub-

stantial harm as a trigger curtails law enforcement's dispersal authority, limiting its power to situations in which imminent property damage or violence prove readily apparent. Such restriction ensures that, with respect to this trigger, Subsection D does not facially encourage standardless decision-making and enforcement at odds with due process.

We conclude, however, that empowering law enforcement to order dispersal when faced with the likelihood of "serious inconvenience" is not immune from arbitrary application. We recognize that predicating law enforcement's power on at least three people's behavior adds definition and heft to the ordinance's "likelihood" language, heightening the required probability of inconvenience before Subsection D may be invoked and limiting when dispersal may be ordered. The ordinance does not, however, limit dispersal authority to situations in which dispersal is *necessary* to ensure the City's safety and order. *See supra* Part II.C.2. To that end, Subsection D "allows an unrestricted delegation of power, which[,] 'in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory[,] and overzealous enforcement.' " *Leonardson*, 896 F.2d at 198 (quoting *Cullinane*, 566 F.2d at 117). The ordinance permits law enforcement too much discretion in determining when addressing a nuisance permits quieting protected expression and when it does not. Moreover, dispersal orders on the basis of "alarm," when the alarm coincides with the likelihood of serious inconvenience, suffers the same infirmity.

Finally, permitting dispersal orders when confronted with "annoyance" alone invites unbridled discretion at odds with the Fourteenth Amendment. The relative, and thus standardless, nature of annoyance renders individuals vulnerable to arbitrary or discriminatory arrest under Subsection D, failing to fulfill due process' second command. *See Skilling*, 130 S. Ct. at 2927-28. Accordingly, we conclude that Subsection D is void for vagueness.

**E.  Subsection D's Total Invalidation is Inappropriate**

As facial failings, overbreadth and vagueness render a law totally invalid. Where, however, constitutional overbreadth or vagueness may be cured, " 'partial, rather than facial, invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.' " *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

As it assesses a law's candidacy for partial invalidation, a court may not invoke its remedial powers to "circumvent the intent of the legislature." *Id.* at 330. "Partial invalidation may not be possible . . . if the legislature would not have passed the law without the unconstitutional element, or if the statute lacks a severability clause and the only way to remove the unconstitutional element is total abrogation of the statute." *Commodity Trend Serv. v. Commodity Futures Trading Comm'n*, 149

F.3d 679, 688 n.4 (7th Cir. 1998) (citing *Brockett*, 472 U.S. at 506).

As acknowledged in oral argument, Bell does not challenge Subsection D's constitutionality to the extent that it legitimizes dispersal when three or more people are engaged in disorderly conduct likely to cause "substantial harm." Additionally, we are confident, based on the City's representations to us, that it would prefer a statute that permits dispersal on the basis of "substantial harm" alone to no statute at all. *See Ayotte*, 546 U.S. at 330. We may, therefore, decline to invalidate Subsection D in toto without invading the province of a legislature or impinging upon principles of federalism. The City may criminalize one's failure "to obey a lawful order of dispersal by a person known by him to be a peace officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm." Chicago Municipal Code § 8-4-010(d).

As for the remainder of Subsection D, the ordinance may be rewritten or construed to avoid facial unconstitutionality. The City may, for example, amend the ordinance so that it applies only when dispersal is necessary to redress an observable, specific nuisance. Furthermore, the City may, as is needed to save the ordinance, abandon altogether dispersal orders on the basis of annoyance. Though these revisions are not overly complex, they are the City's to make. We leave to the City the right to remedy its ordinance as it sees fit, *see Am. Booksellers Ass'n*, 484 U.S. at 397, restraining ourselves from

a "serious invasion of the legislative domain," *Ayotte*, 546 U.S. at 330. We decline to rewrite Subsection D, and we find the following unconstitutional: "or serious inconvenience, annoyance, or alarm." Chicago Municipal Code § 8-4-010(d).

## III. Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.